501 A.2d 226

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Rev. Daniel BERRIGAN, S.J., Rev. Philip Berrigan, Sister Anne Montgomery, R.S.C.J., Elmer H. Maas, Rev. Carl Kabat, O.M.I., John Schuchardt, Dean Hammer and Molly Rush, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1984.

Decided Nov. 22, 1985.

Ronald T. Williamson (Chief/Appeals Div.), Joseph Hylan, Norristown, for appellant.

Ramsey Clark, New York City, (Pro Hac Vice), Thomas Colas Carroll, Philadelphia, Charles A. Glackin, Jenkintown,

Peter Goldberger, Los Angeles, Michael C. Shields, Norristown, Richard Falk, Princeton of counsel, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

The Commonwealth of Pennsylvania (Appellant) appeals Superior Court's reversal of the judgments of sentence of the Court of Common Pleas of Montgomery County, Criminal Division, at No. 2647–80. Appellees were convicted by a jury on charges of burglary,[1] criminal mischief,[2] and criminal conspiracy,[3] for their September 9, 1981, trespass into a General Electric plant in King of Prussia, Montgomery County, Pennsylvania. Appellees admitted entering the plant, destroying missile components with hammers, pouring human blood on the premises, and causing some $28,000.00 in property damage.

At a trial by jury, presided over by the Honorable Samuel W. Salus, II, Appellees sought to defend their actions as falling within Section 510 of the Crimes Code,[4] which provides:

**Section 510. Justification in property claims**

Conduct involving the appropriation, seizure, or destruction of, damage to, intrusion on or interference with property is justifiable under circumstances which would establish a defense of privilege in a civil action based thereon, unless:

(1) this title or law defining the offense deals with the specific situation involved; or

(2) a legislative purpose to exclude the justification claimed otherwise plainly appears.

**1.** 18 Pa.C.S. § 3502.
**2.** 18 Pa.C.S. § 3304.
**3.** 18 Pa.C.S. § 903.
**4.** 18 Pa.C.S. § 510.

Appellees attempted to present evidence from claimed experts which was intended to support their contentions that their actions were necessary to prevent a nuclear holocaust. The trial court rejected this offer, ruling as a matter of law that the justification defense as defined in Section 510 was not available to Appellees because they could not establish that the operation of the General Electric facility constituted an "imminent danger" to the public, justifying Appellees' trespass thereon and concurrent criminal conduct. Appellees were permitted to testify as to their reasons for entering the plant property, but the jury was instructed that, as a matter of law, the justification defense was not available as a defense for Appellees' actions.

On March 6, 1981, guilty verdicts against Appellees were returned on the burglary, criminal mischief, and criminal conspiracy charges from which post-trial motions for a new trial and motions in arrest of judgment were filed.

The post-trial motions were argued before a court en banc (Nicholas, Scirica, Salus, JJ.) which denied same by order of June 26, 1981. Appellees were thereupon sentenced to varying terms of imprisonment. Appellees appealed their convictions and sentences to Superior Court which, by its en banc opinion and order (Cercone, P.J. Spaeth, Hester, Brosky, Wieand, Beck, and Johnson, JJ.), reversed the judgments of sentence and remanded for a new trial. Judges Wieand, Hester, and Johnson dissented in part. *See, Commonwealth v. Berrigan*, 325 Pa.Super. 242, 472 A.2d 1099 (1984).

We granted allocatur because of the importance of defining the extent to which the justification defense of 18 Pa.C.S. § 510 is applicable, generally and under these facts, and to consider issues of voir dire and public trial involved herein.

Appellant argues that Superior Court erred in concluding that Section 510 was an available defense for Appellees' conduct. Appellant also argues that Superior Court erred in finding that the trial court abused its discretion in conducting the voir dire proceeding 1) where it restricted

access to the proceedings from members of the public, and 2) in not conducting individual voir dire questioning of each prospective juror.

We now reverse and order reinstatement of the sentences.

## JUSTIFICATION DEFENSE

 Our Crimes Code embraces the concept that conduct which would otherwise constitute a crime can be excused when necessary to prevent a greater harm or crime. This justification extends to actions taken to protect oneself, others, and property. (See 18 Pa.C.S. §§ 505, 506, 507, 509). Specifically, crimes to or on the property of another can be committed for the purpose of averting a public disaster when circumstances arise which would establish the civil law defense of privilege. (18 Pa.C.S. § 510).

As codified by the Restatement of Torts Second, the law will excuse a trespass onto the land of another, "if it is, or if the actor reasonably believes it to be necessary for the purpose of averting an imminent public disaster" (Section 196). Similarly, trespass to the chattel of another or its conversion is excusable "if the act is or is reasonably believed to be necessary for the purpose of avoiding a public disaster" (Section 262).

This defense is based on emergency and can be asserted only by one who is confronted with a widespread public crisis which does not allow the actor to select from among several solutions, some of which do not involve criminal acts. The threatened disaster (manmade or act of God) must be real and immediate, not imagined or speculative, and must threaten not only the actor but others as well. The actions taken to avoid the public disaster must support a reasonable belief or inference that the actions would be effective in avoiding or alleviating the impending harm. Additionally, the defense cannot be available in situations where the conduct some perceive to engender public disaster has been specifically approved of by legislation making

it legal conduct, or where a legislative purpose appears to exclude the defense.

By reading Section 510 of our Crimes Code together with Sections 196 and 262 of the Restatement of Torts Second, it is clear to us that the defense of justification will lie only where the actor offers evidence that will demonstrate:

1) that the actor was faced with a public disaster that was clear and imminent, not debatable or speculative;

2) that the actor could reasonably expect that the actions taken would be effective in avoiding the immediate public disaster;

3) that there is no legal alternative which will be effective in abating the immediate public disaster;

4) that no legislative purpose exists to exclude the justification from the particular situation faced by the actor.

As with any offer of proof, it is essential that the offer meet a minimum standard as to each element of the defense so that if a jury finds it to be true, it would support the affirmative defense. Where the offer is insufficient to establish any one element of the defense, the trial court may deny use of the defense and prohibit evidence as to the other elements of the defense.

In the case *sub judice,* Appellees attempted to justify their actions by relying on the argument that their actions were permitted by Section 510 to avert a nuclear holocaust. Reviewing this offer, we conclude that the trial court acted properly in ruling, as a matter of law, that the offer was insufficient to establish that the harm Appellees perceived was a clear and imminent public disaster. In so ruling, the trial court was also correct in preventing Appellee Mass from testifying concerning the power of a nuclear weapon, the likelihood of accidental or intentional nuclear warfare, or the philosophies and principles in current vogue among various authors against the use of nuclear armaments.

Even if the hazards from the detonation of a nuclear warhead represented an imminent harm when Appellees

committed their trespass, the hazards accompanying the improper use of nuclear energy are so commonly known to the general public that the expert testimony Appellee Mass attempted to introduce into evidence would not have been admissible. *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976); *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776 (1976). Expert testimony that a nuclear weapon is capable of maiming or killing masses of people is no more necessary than expert testimony as to the manner in which people dial a telephone, chew gum, or tie their shoes.

Appellees' continual attempts to focus attention onto the destructive nature of nuclear weaponry was not the harm with which Appellees were confronted when they trespassed onto the plant because the plant Appellees entered only produced bomb shell casings. The mere manufacture of bomb shell casings cannot be viewed as the type of dangerous activity which could result in a public disaster so as to justify criminal activity aimed at abating that conduct.

Furthermore, the actions chosen by Appellees (destruction of the casings and pouring of human blood) could not under any hypothesis reasonably be expected to be effective in avoiding the perceived public disaster of a nuclear holocaust. To the contrary, the record establishes that these criminal acts were deliberate and calculated choices and not the acts that would even practically abate an immediate public disaster.

Superior Court's conclusion that the *use* of nuclear weapons was a sufficient public disaster for purposes of § 510, is misplaced. *Use* of the weapons was not the harm Appellees were confronted with, only the manufacture of shell casings. The process of manufacture is so removed from the ultimate question of use as to be pure conjecture and speculation and, hence, presents, at most, a non-imminent danger.

In the absence of evidence of imminence of public disaster, the trial court committed no error in refusing Appellees' request to charge on Section 510 or to permit Appellee

Mass to testify on the destructive force accompanying use of nuclear arms.[5]

## VOIR DIRE PROCEEDINGS

### A. Exclusion of Spectators

Appellant next argues that Superior Court erred in concluding that the trial court committed reversible error by limiting access to the courtroom during the voir dire proceedings. This conclusion was reached in reliance, primarily, upon the recent United States Supreme Court decision in *Press-Enterprise Company v. Superior Court of California, Riverside County*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629, 52 U.S.L.W. 4113 (1984). We find such reliance inappropriate.

The entire voir dire was conducted over a five day period. To place the issue in proper perspective, we must first paint a backdrop against which the events unfolded during this five day period. We know that the conduct of the defendants which culminated in their arrest and brought them before the bar of justice had evoked great public interest, pro and con. Media had kindled public debate by extensive coverage and with publicized interviews of the participants.

Protagonists and antagonists had gathered outside the courthouse necessitating the establishment of police lines through which prospective jurors had to pass to enter the courthouse in safety. An aura of intimidation was prevalent.

Because of the large number of participants the trial would entail, the trial judge moved the proceedings into a large courtroom which apparently doubled for other contemporaneously held legal activities. As the trial judge

---

5. We also note that since the manufacture of shell casings for nuclear warheads is legal conduct, (see Model Penal Code comment LT.D. No. 8, pp. 1–2), it is the type of conduct to which the Legislature has spoken in excluding the justification defense. 18 Pa.C.S. § 510(2). This is in keeping with the general proposition that the justification defense is aimed at stopping perceived *illegal* conduct, not legal conduct. See *Atomic Energy Act of 1954*, 42 U.S.C. § 2011, et seq.

explained at the commencement of the proceedings on Monday, February 23, 1981, at 10:55 a.m. (p. 3 N.T.) "In this particular courtroom, there is a constant stream of traffic on the left side of the courtroom which will interfere with the ability to hear at some times."

Appellees, themselves, brought to the attention of the trial judge that a multitude of demonstrators or people had gathered on the steps outside the courthouse. Appellees feared that this scene could be extremely intimidating upon prospective jurors who had to pass through these lines to gain entrance into the courthouse.

Extremely disturbing incidents were occurring in front of the courthouse among police, demonstrators, and visitors. The police were having a difficult time controlling the people. On one occasion some fifteen (15) persons were arrested on charges of disorderly conduct. It was reported to the trial judge that a press person had been violently handled and his camera seized and thrown to the floor of a car.

And the Appellees, understandably agitated from the events that were swirling about them, were having difficulty comporting themselves in the quiet, dignified, and measured manner which is essential to the conduct of a fair and impartial trial in our courts. They often allowed themselves to become disorderly and tumultuous. They repeatedly disrupted the proceedings by walkouts, demonstrations, singing, refusal to acknowledge the court, physical acts of defiance, persistant disregard of court rulings and verbal attacks upon prospective jurors. When spectators were in the courtroom, they, too, joined in the tumultuous and anarchistic behavior of the Appellees.

Expressing the various, and sometimes conflicting, rights which emanate from the guarantee of a public trial, the trial judge exercised his discretion in a balancing test and limited access to the courtroom during voir dire. All members of the press, without limitation as to numbers, were freely admitted. In fact, more than one row had to be used to accommodate them all. Court attendants, including a court

reporter, as well as Appellees and their advisory counsel, and all others having business on the left side of the courtroom, and prospective jurors were freely in the courtroom. Only members of the general public who had no personal, legal involvement with the proceedings were excluded during the five days of the voir dire proceedings.

On the first day of voir dire, a panel of forty (40) jurors was brought into the courtroom to be seated. Clearly, there was not sufficient room to accommodate spectators and they were properly excluded. However, when the selection process became burdened with the conduct of Appellees and the panel itself, the trial judge dismissed the entire panel as having become contaminated and thereafter conducted the voir dire with groups of four prospective jurors at a time.

The first day of voir dire found the courtroom crowded and unruly. Appellees were interrupting each other in questioning the panel and arguing with the court. Appellees complained "there was so much chattering among the people yesterday that we felt was extremely hostile, and they kept really talking to one another, and infecting one another."[6] One Appellee in the presence of the entire panel, moved to challenge for cause nine (9) members of the panel who had indicated partiality. This oral attack upon the veniremen caused a contamination of the entire panel and the trial judge dismissed the entire panel.

On the next four days of voir dire, since a clear and present danger to the peace and tranquillity of the courtroom existed, which danger could adversely affect the proceedings by intimidating prospective jurors, thus denying Appellees the selection of a fair and impartial jury, the trial judge again exercised his discretion and limited access to the proceedings to all persons except those members of the general public who would attend as mere spectators. Surely the evidence was sufficient for any reasonable person to conclude that these spectators seeking access to the proceedings would be none other than those same persons who

6. N.T. 2/24/81 at p. 119, statement of Philip Berrigan.

were involved in demonstrations on the courthouse steps. By keeping these elements of the general public out of the courtroom, the trial judge insured that prospective jurors would not come in contact with, or be subjected to, extraneous or intimidating influences while being brought in and out of the courtroom.

■ Under the circumstances of this case, did the trial court commit reversible error in excluding members of the general public from the voir dire proceedings? We believe not.

The right to a public trial, as guaranteed in our state[7] and federal[8] constitutions, serves two purposes. An accused cannot be subject to a star chamber proceeding and the public is assured that standards of fairness are being observed. Confidence in our system of jurisprudence is enhanced by such openness.

It has been established already that the First Amendment to the Federal Constitution is broad enough to encompass the right of access to criminal trials to the public and media, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed. 973 (1980), and that this right of access extends to voir dire examinations of potential jurors. *Press-Enterprise Company v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629, 52 U.S.L.W. 4113 (1984).

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known.

A trial judge may impose restrictions to maintain the integrity of the proceedings in the courtroom. The United States Supreme Court held in both *Press-Enterprise,* id., and *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 581, n. 18, 100 S.Ct. at 2830 that a trial judge may "in the

7. Article I, § 9, Pennsylvania Constitution.
8. First and Sixth Amendments, Constitution of the United States.

interest of the fair administration of justice, impose reasonable limitations on access to a trial."

The Supreme Court went on to state the standard for such limitation of access:

> The question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places. (Quoting *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)).

In the present case, it is clear that "the opportunities for the communication of thought and the discussion of public questions" were not abridged at all. A stenographic record was made which, itself, is a matter of public record. The record indicates that the eight Defendants made speeches and gave interviews to the media after each court session. In addition, a large number of the press actually attended the entire trial, including all of the voir dire. Thus, the public perception of an open trial was never *threatened*. The public was able to read newspaper reports and listen to radio reports of the trial and they were able to see the Defendants airing their views on television. No information was concealed from the public.

This fact alone distinguishes the present case from the *Press-Enterprise* case in which the trial judge lowered an impenetrable canopy of secrecy over the six week long voir dire proceedings for the *sole* purpose of safeguarding the privacy interests of jurors. The United States Supreme Court disapproved because:

> The judge at this trial closed an incredible *six* weeks of *voir dire* without considering detriments to closure. Later the court declined to release a transcript of the *voir dire* even while stating that "most of the information" in the transcript was "dull and boring," *supra*, at —— [104 S.Ct. at 821]. Those parts of the transcript reasonably entitled to privacy could have been sealed without such a

sweeping order. A trial judge should explain why the material is entitled to privacy.

The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected. *Press Enterprise,* 464 U.S. 501, at, 78 L.Ed.2d 629 at 640, 104 S.Ct. 819, at 826 (1984).

Moreover, we believe that the need to keep juries free from outside influences by sequestering them, sometimes overnight in a hotel, and finally locking them behind the closed doors of the jury room is well understood and appreciated by the public in a free society such as ours.

By the same reasoning, the Defendants were not prejudiced by the court's limited restriction on spectators.[9] The free dissemination of information regarding the trial by those who were in attendance prevented any cloak of secrecy to encompass the voir dire. The voir dire was "open" except to certain spectators and the Defendants were no more prejudiced by keeping jurors apart from the public at this stage than they are when the jury is sequestered during the deliberation stage.

The trial court denied access to spectators during the entire voir dire proceedings of some (5) days, but permitted media representatives to attend, and directed that the entire

---

**9.** We note that *Press-Enterprise* does not apply to the Defendant's public trial rights. In that case, the majority noted:

... the question we address—whether the *voir dire* process must be open—focuses on First, rather than Fifth, Amendment values and the historical backdrop against which the First Amendment was enacted. 464 U.S. 501, at 517, n. 8, 104 S.Ct. 819, at 828, 78 L.Ed.2d 629, at n. 8 (1984).

Mr. Justice Stevens, in his concurring opinion in *Press-Enterprise,* noted that:

If the *defendant* had advanced a claim that his *Sixth Amendment* right to a public trial was violated by the closure of the *voir dire,* it would be important to determine whether the selection of the jury was a part of the "trial" within the meaning of that Amendment. But the distinction between trials and other proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues. 464 U.S. at 501, 104 S.Ct. 819, at 827–28, 78 L.Ed.2d 629, at 642 (1984).

voir dire proceedings be stenographically recorded as part of the record.

That record indicates that on the first day of jury selection, the court cleared the courtroom of public spectators to permit a panel of forty (40) jurors to be seated in the courtroom for questioning. Since the courtroom was not large enough to accommodate both spectators and the jury panel, the court's action in removing the spectators was reasonable in the interest of the fair administration of justice and must be affirmed.

On the second day of jury selection, the trial court directed that the panels be brought in four (4) persons at a time, because handling the full panel of forty (40) prospective jurors proved unworkable. The denial of access to the court proceedings for spectators continued, however, because the trial court felt that the orderly ushering, questioning, and removal of four (4) person panels would be hampered by the presence of a packed courtroom.

We glean from the record that the courtroom was limited in size, that the number of spectators exceeded the seating capacity of the courtroom, and that the spectators who wished to observe these proceedings could intimidate prospective jurors as they were brought in and out of the courtroom, because of the spectators' number and particular bias for or against Appellees.

We note that during the entire jury selection process and trial, supporters of Appellees stationed themselves outside the courthouse, and blocked access to the building and surrounding streets while demonstrating, singing, yelling, and waving placards and banners. Supporters and news media representatives also blocked the halls of the courthouse, impeding access into and out of the courtroom. Given the physical layout of the courtroom and atmosphere surrounding the proceedings, we cannot say that the trial court erred in limiting public access during the voir dire proceedings.

Dignity, order, and decorum are the hallmarks of all court proceedings in our country, (See, *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed. 353 (1970)), and trial judges are in the best position to observe, assess, and guarantee that orderly proceedings are conducted before them.

Ultimately, the determination of whether to exclude spectators, as well as the determination of the scope and duration of an exclusion order, must be left to the sound discretion of the trial court because it alone is sufficiently close to the circumstances to apprehend fully the subtleties that may be present. Thus, only if a trial court abused its discretion in issuing an exclusion order or in fashioning the order will reversible error be found on appeal. *Commonwealth v. Knight,* 469 Pa. 57, 66, 364 A.2d 902, 906–07 (1976).

■ Accordingly, trial judges are vested with broad discretion in setting and enforcing the standards of proper conduct for all those who seek to attend judicial proceedings before them. We should not be hasty to reverse a trial judge's actions in establishing order in his courtroom, unless his actions are not designed to maintain dignity, order, and decorum, and instead deny or abridge unwarrantedly the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places. *Cox.*

There is no question that under certain circumstances obstreperous defendants may be ejected from a courtroom during the course of the trial, even though the Sixth Amendment of the Federal Constitution guarantees the right of a defendant to be present in the courtroom at every stage of his trial and to be confronted with witnesses against him. *Allen.* Similarly, unmanageable, boisterous, disrespectful, or disruptive members of the public who wish to attend a criminal court proceeding can be barred to guarantee the orderly administration of justice. The public's right to attend a trial is not absolute, and exists as a guarantee of fairness in judicial conduct during criminal court proceedings.

Where trial courts perceive a threat to the orderly administration of justice in their courtrooms by an unmanageable public, they may always place reasonable restrictions on access to the courtroom, so long as the basic guarantees of fairness are preserved such as by the presence of the press and the making of a record for later review.[10]

In the case before us, the number of potential jurors (over 100) and the manner in which they had to be ushered into and out of the courtroom required the court to impose access restrictions to maintain order in the proceedings and insure that the process would not be unnecessarily delayed. The restriction was reasonable, under the circumstances, because it was fashioned in response to the problem of handling the selection of jurors in front of a large unmanageable crowd that could intimidate by its size, chattering,

10. In his dissent, Mr. Justice Flaherty states that, "In *Commonwealth v. Contakos,* 499 Pa. 340, 453 A.2d 578 (1982), this Court *clearly* held that ... it is improper to exclude the public from a segment of a criminal trial." (Emphasis added.) Messrs. Justice Flaherty and Larsen were then, and still now, are welded to this impractical view. Mr. Justice Nix (now Chief Justice) decried this "absolute and inflexible rule" in his dissent in which Mr. Justice Hutchinson joined. Mr. Justice Roberts, joined by Mr. Chief Justice O'Brien, in a concurring opinion, rejected this view and determined that Contakos was denied a *fair* trial and not his *right* to a public trial "because the *sudden* exclusion of the public from appellant's trial during the testimony of the Commonwealth's chief witness may well have served to prejudice the jury against appellant, justice requires that appellant be granted a new trial." Mr. Justice Roberts and Mr. Chief Justice O'Brien expressed absolutely *no* concern over the *fact* of an absent public.

Mr. Justice McDermott, in a clarifying dissent, explained the author's work as follows: "Fortunately, the majority has confined its attention to the facts of this case and has not exalted the mandate into an all-encompassing rubric that suffers no exception. For, indeed, there are exceptions as this Court so plainly stated in *Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902, 904 (1976)."

*Contakos* does not stand for the implacable view that "... it is improper to exclude the public from a segment of a criminal trial." It very simply applies *Knight* and finds that the trial court did not exercise sound discretion in excluding the spectators during the testimony of a witness and, thus, denied the defendant therein a fair trial.

Just as the Court in *Contakos* examined the soundness of the discretion of the trial court and found it wanting, so, too, do we examine the soundness of the discretion of Judge Salus in this case and find it appropriate.

movement, and reaction to questions and answers. When the selection process was completed, the need to insulate the jurors from the uncontrollable reactions of the crowd ceased, as did the access restrictions.

## B. Individual Voir Dire

Appellant also argues that Superior Court erred in ruling that the trial court erred in not considering an individual voir dire examination of prospective jurors. We agree. Our Rules provide that in non-capital cases the trial court is vested with discretion in the method by which the voir dire examination shall be conducted.[11] Absent an abuse of such discretion, a reviewing court cannot disturb the trial court's actions.

In this case, the trial court chose, on the first day of voir dire, to examine a panel of forty prospective jurors within the hearing of each other, and permitted active questioning of the prospective jurors by all defendants. That panel was dismissed because one of the Appellees raised a challenge for cause and exposed the panel to a prejudicial discussion between the court, advisory counsel, and the Appellees.

**11.** Pennsylvania Rule of Criminal Procedure 1106 provides in pertinent part:

**Examination and Challenges of Trial Jurors**

(a) Voir dire of prospective trial jurors and prospective alternate jurors shall be conducted, and the jurors shall be selected, in the presence of a judge.

(e) In non-capital cases, the trial judge shall select one of the following alternative methods of voir dire, which shall apply to the selection of both jurors and alternatives.

(1) **Individual Voir Dire and Challenge System**

(a) Voir dire of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors.

(2) **List System of Challenges**

(a) A list of prospective jurors shall be prepared. The list shall contain a sufficient number of prospective jurors to total at least twelve, plus the number of alternates to be selected, plus the total number of peremptory challenges (including alternates).

(b) Prospective jurors may be examined collectively or individually, regarding their qualifications. If the jurors are examined individually, the examination may be conducted beyond the hearing and presence of other jurors.

To prevent dismissing other full panels, the trial court decided to question the veniremen in panels of four for the remainder of the jury selection process. When questioning by all eight Appellees became too unruly, the court conducted the questioning as permitted by Pa.R.Crim.P. 1106, and permitted questions by Appellees as it deemed proper.

The decision to question four prospective jurors at a time was well within the trial court's discretion and we perceive no abuse of discretion in so deciding, based on our review of the record. Superior Court's conclusion that individual voir dire questioning was required because of *prejudicial* pre-trial publicity is simply not supported in the record. To be sure, there was extensive pre-trial publicity surrounding this case, but there is nothing in this *record* which demonstrates that the publicity was derogatory or prejudicial to the Appellees or their cause. In fact, Appellees never preserved for the *record* in their appeal to Superior Court the nature and extent of the publicity in the form of exhibits, other than some interviews in the *New York Times*. Rather, Appellees have improperly attempted to augment the *record* by including in the Brief allegations of specific incidents of publicity which were not presented to the trial court. "Alleging facts in a brief which a trial court has not passed on has been specifically condemned, *In re: Legislative Route 1018*, 422 Pa. 594, 222 A.2d 906 (1966); *McCaffrey v. Pittsburgh Athletic Association*, 448 Pa. 151, 293 A.2d 51 (1972); *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974), and we continue to view such practice as improper." *Reilly, et al v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985).

The record before us reveals that most prospective jurors had heard or read about this case. The record also reveals that Appellees never once complained about the extent or content of the publicity they were generating. The record further reveals that most prospective jurors affirmed that they would be able to judge the Appellees fairly based on the evidence presented at trial.

Having had the opportunity to observe the demeanor of the prospective jurors and to assess the tenor of their answers and having participated in the examination of the prospective jurors, the trial judge determined that those who were selected would give fair and impartial consideration to the evidence without being "locked-in" to any preconceived notions gained from media coverage. The trial court's determination is entitled to great weight by an appellate court, *Commonwealth v. Backert*, 499 Pa. 398, 453 A.2d 931 (1982), and only palpable error resulting in an abuse of discretion justifies reversal on this issue. *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977). We find no such palpable error in this record.

Since the Appellees entered these proceedings admitting their criminal conduct but seeking only to justify same under our statutes permitting justification as a defense, we do not find that the answers given by prospective jurors tainted other prospective jurors who heard the answers. "It is sufficient if a juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Ivin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Our review of the record reveals no abuse of discretion in questioning four prospective jurors at a time, or in the manner the questioning was conducted. We are satisfied that a competent, fair, impartial, and unprejudiced jury was selected. *Commonwealth v. Futch*, 469 Pa. 422, 366 A.2d 246 (1976).

Reversed. Judgments of Sentence Reinstated.

LARSEN, FLAHERTY and ZAPPALA, JJ., filed dissenting opinions.

LARSEN, Justice, dissenting.

I dissent. The Pennsylvania Constitution explicitly provides: "All courts shall be open." Pa.Const. Article I, section 11. Furthermore, in "all criminal prosecutions the accused hath a right to ... a speedy public trial...."

Pa.Const. Article I, section 9. Thus, the Pennsylvania Constitution specifically mandates that "the public shall not be excluded from trials, the courts shall not be closed." *Commonwealth v. Contakos*, 499 Pa. 340, 345, 453 A.2d 578, 581 (1982) (per Flaherty, J., joined by Larsen, J.). The First and Fourteenth Amendments to the Constitution of the United States, though not as explicit, also guarantee that criminal proceedings, including the jury selection process, should presumptively be public and open. *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).

While these constitutional mandates of open and public trials are not absolute,[1] the strong presumption of openness may only be overcome "by an overriding interest based on findings that closure is *essential to preserve higher values and is narrowly tailored to serve that interest.* The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed.2d at 638. (emphasis added). Not only must the court articulate specific findings as to the interests to be furthered by restricting public access to the courtroom, it must also indicate on the record that it considered alternatives to closure and its reasons for rejecting the alternatives. *Id.* 464 U.S. at 512, 513, 104 S.Ct. at 825–26, 78 L.Ed.2d at 639–40.

In the instant case, the record is wholly inadequate to support the court's exclusion of members of the general public, including appellees' family members, from the voir dire proceedings. The recitation of the facts as set forth in the majority opinion makes that inadequacy apparent. There is certainly record evidence of contumacious and obstreperous *defendants,* as well as evidence of boisterous and demonstrative *spectators outside of the courthouse* —there is, however, precious little on the record to indicate

1. *See Commonwealth v. Hayes,* 489 Pa. 419, 414 A.2d 318 (1980) *and Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902, 904 (1976).

that the members of the general public in the courtroom during voir dire had caused any significant disruption sufficient to warrant the drastic measure taken here of closing the courtroom to *all* members of the general public. The dangers perceived by the lower court were simply too speculative to permit such restrictions.[2]

Moreover, the constitutional guarantees of public and open trials are not met merely by allowing access to the courtroom to one or more special interest groups such as the press. As was recently stated in *Commonwealth v. Contakos, supra:*

> [T]he openness mandated by our constitution is not satisfied if only representatives of the media are present in the courtroom. Exclusion of the public would strike at the essence and meaning of our mandate for an open court, for the public counterbalances what might otherwise become a tyranny of the media, and the public and the media together counterbalance the possible emergence of a corrupt or biased judiciary.

499 Pa. at 345, 453 A.2d at 581.[3]

Because, on the record before us, closure of the voir dire proceedings to the general public was unwarranted and violated the defendants' (and the public) rights to an open and public trial, I would affirm the Superior Court and remand for a new trial.

FLAHERTY, Justice, dissenting.

I dissent. Members of the general public were excluded from the courtroom during the voir dire phase of appellees' trial, though representatives of the news media were permitted access. In *Commonwealth v. Contakos*, 499 Pa. 340, 453 A.2d 578 (1982), this Court clearly held that, under

---

**2.** *See* analysis of lower court record in concurring and dissenting opinion of Judge Wieand, 325 Pa.Super. 242, 472 A.2d at 1119–20.

**3.** I am unpersuaded by the majority's attempt to distinguish *Contakos* by the simple expedient of declaring "that the trial court therein prejudiced the right of the defendant to a fair trial by the *manner* in which the public exclusion occurred and the decision is, thus, *sui juris.*" Majority slip op. at 21, n. 10.

applicable provisions of the Pennsylvania Constitution, it is improper to exclude the public from a segment of a criminal trial. As indicated in *Contakos*, the mere fact that the news media were present does not mitigate the infringement of the public's right of access: "The public and representatives of the press alike enjoy the constitutional right in Pennsylvania to attend trials. Neither may be excluded because the other is present." 499 Pa. at 348, 453 A.2d at 582. Appellees' rights to a public trial have been violated, and a new trial should be granted.

ZAPPALA, Justice, dissenting.

I dissent.

In *Commonwealth v. Knight*, 469 Pa. 57, 65, 364 A.2d 902, 904 (1976) we held:

> ... the right to a public trial is not absolute; rather, it must be considered in relationship to other important interests. In considering such other interests, a court must assess all of the circumstances to determine if they present a situation in which an exclusion order is necessary. If the court determines a necessity exists, it may then issue an exclusion order; but *the exclusion order must be fashioned to effectuate protection of the important interest without unduly infringing upon the accused's right to a public trial either through its scope or duration.*[1] (emphasis added)

On appeal, we may reverse only if the trial court has abused its discretion in balancing the competing interests. *Knight, supra.*

Chief Justice Burger of the United States Supreme Court aptly sets forth the importance of the openness of our trial system in *Press-Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984).

> This openness has what is sometimes described as a "community therapeutic value". Criminal acts, especially violent crimes, often provoke public concern, even out-

---

**1.** Citations and footnotes omitted.

rage and hostility; this in turn generates a community urge to retaliate and desire to have justice done. Whether this is viewed as retribution or otherwise is irrelevant. When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that the offenders are being brought to account for their criminal conduct by jurors fairly and openly selected. (citations omitted) Furthermore, the U.S. Supreme Court held in *Press-Enterprise Co.,* that sufficient evidence must be demonstrated to warrant the extreme sanction of closure of the public trial rather than other alternatives.[2]

The present record is conspicuously devoid of any evidence to support closure or any attempt to structure reasonable alternatives to that extreme sanction. On the first day of voir dire, the court, without notice, cleared the courtroom because of insufficient room to seat *all* the jurors and *all* the members of the news media. (N.T. 2/23/81, p. 98). On the second day of voir dire, the trial court chose to change the procedure and question only four prospective jurors at a time. (N.T. 2/24/81, p. 118). Yet, upon request for an open proceeding, the court ruled that it did not want the jurors, "to come in contact with any extraneous influences while being brought back and forth from the other courtroom." (N.T. 2/24/81, p. 123). Although the court indicated fire considerations were involved, it expanded the seating capacity for the news media. The court then expressed concern that spectators from the general public would "start eating and opening up Lifesavers and things like that." (N.T. 2/24/81, p. 124). Finally, on the fourth day of jury selection, upon the defendants' request for an open voir dire, the

**2.** As Justice Stevens correctly stated in his concurring opinion, the *Press-Enterprise Co.* case involved First Amendment rather than the Sixth Amendment protection. However, I believe the majority's analysis is in accord with our decision in *Knight, supra.*

trial court refused indicating that the news media would protect the openness of the proceedings. The court also indicated that interruptions and distractions mandated a closed proceeding. (N.T. 2/26/81, p. 700).

While all of these concerns may have required additional security measures to protect the fairness of the jury selection process, and the orderly administration of justice, none of these reasons either singularly or as a group required the extreme sanction of expulsion of the general public. Never should it be mistaken, misunderstood or misinterpreted, that the news media, electronic, newsprint or otherwise, will ever supplement the sanctity of the general public's right to access. Furthermore, it is clear from *this* record that the circumstances did not warrant closure of the jury selection process. In fact, in the appellant's brief we are not directed to any portions of the record which substantiate any necessity of barring the general public for the voir dire. If sufficient room existed to increase space for the news media, surely sufficient room existed to permit an orderly rotation of a few members of the general public to view the jury proceedings. The fact that the trial itself was open lends support to the proposition that the trial court acted improperly in closing the voir dire.

Since the trial court set forth *no compelling reasons* to deny to the defendants their Sixth Amendment right to a public trial, I would hold, that on this record, the trial court abused its discretion and would affirm the order of the Superior Court granting the defendants a new trial.

## ORDER

PER CURIAM.

AND NOW, this 24th day of February, 1986, upon consideration of Appellees' Application for Reargument or, in the Alternative, for Remand to the Superior Court, the Order of this Court dated November 22, 1985, is vacated to the extent it reinstates Appellees' judgments of sentence. The matter is remanded to the Superior Court for disposition of

all issues raised in that court, but not yet considered. In all other respects, the Application is denied.