562 A.2d 833

**COMMONWEALTH of Pennsylvania**

**v.**

**Meredith PENN, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 7, 1988.

Filed July 7, 1989.

Reargument Denied Aug. 31, 1989.

134

Athena M. Dooley, Philadelphia, for appellant.

Donna G. Zucker, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

Before CIRILLO, President Judge, and BECK and KELLY, JJ.

KELLY, Judge:

In this case we are called up to determine whether the trial court abused its discretion and committed reversible error in closing a trial to the public during the testimony of a Commonwealth witness who alleged that he had been threatened and harassed by unidentified persons who did not want him to testify against appellant at his murder trial. For the reasons which follow, we reverse and remand for a new trial.

The relevant facts may be accurately summarized as follows. Appellant was arrested and brought to trial on murder charges relating to the shooting death of his estranged common-law wife in Philadelphia on August 4, 1984. Mr. Theodore Reed, a security guard and friend of appellant, was subpoenaed to testify against appellant regarding a full and detailed confession of the crime made by appellant to Mr. Reed shortly after the murder. Mr. Reed failed to appear in compliance with the subpoena and so a bench warrant was issued for his arrest.

Prior to the start of the afternoon session on the second day of the trial, the prosecutor informed the court that Mr. Reed had voluntarily presented himself at the prosecutor's office and was now prepared to comply with the subpoena. The prosecutor informed the court further that Mr. Reed had explained his failure to appear as the result of his fear following the breaking of several windows at his home and the receipt of several anonymous calls on the previous evening which threatened injury to him and his four children if he testified against appellant at trial, as well as being accosted outside the courtroom that morning by persons he could not or would not identify, who also requested that he change his testimony. The prosecutor indicated that Mr. Reed was "perfectly willing to testify, but that he was very intimidated about testifying in front of a full courtroom." (N.T. 9/10/86 at 89). The prosecutor moved that the bench warrant against Mr. Reed be withdrawn, and that the court be closed to spectators during Mr. Reed's testimony.

Counsel for appellant agreed that anyone who was attempting to intimidate a witness or suborn perjury should be identified and prosecuted. Counsel indicated that there were numerous defense witnesses and supporters present for the trial and requested that Mr. Reed be brought in to view those present and then have him identify anyone who intimidated him, or of whom he was afraid. Counsel noted that Mr. Reed was an adult male who was employed as a security guard, and not a child witness or a victim of a sex

crime for whom special consideration might be appropriate. Finally, counsel objected to the motion to clear the courtroom of all spectators during Mr. Reed's testimony on the basis of appellant's Sixth Amendment right to a public trial.

The trial court granted the motion to close the courtroom during Mr. Reed's testimony and denied appellant's motion for a mistrial on the basis of the closure. After Mr. Reed's testimony, the public was again admitted into the courtroom.

Appellant was convicted of murder in the first degree and possession of an instrument of crime. Post-verdict motions were filed, briefed, argued, and denied. On January 28, 1987, appellant was sentenced to life imprisonment on the murder conviction and a concurrent two and one-half to five year term of imprisonment on the possession of an instrument of crime conviction. This timely appeal followed.

On appeal, appellant challenges the partial closure of the trial and raises three other claims of trial court error and fourteen allegations of ineffective assistance of counsel. Because we find merit in appellant's Sixth Amendment denial of a public trial claim, we decline to address his other assertions of error.

Appellant argues that reversal is mandated by our Supreme Court's decision in *Commonwealth v. Contakos*, 499 Pa. 340, 453 A.2d 578 (1982) (*plurality*). The Commonwealth notes that because *Contakos* was a plurality opinion it is not binding on this Court, and argues instead that a trial court has inherent discretionary authority to clear the court during the testimony of a witness who has been threatened. The Commonwealth cites *Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976) and *Commonwealth v. Wright*, 255 Pa.Super. 512, 388 A.2d 1084 (1978) as controlling precedent. While each of the cases cited by the parties is relevant to our decision, our course lies between the two extremes urged and is guided by other authorities as well.

"Criminal trials in the United States have, by historical tradition, and under the First Amendment, been deemed

presumptively open to public scrutiny and this '... presumption of openness inheres in the very nature of the criminal trial under our system of justice.' " *Commonwealth v. Fenstermaker*, 515 Pa. 501, 506, 530 A.2d 414, 417 (1987), *quoting Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973, 987 (1980). The purposes of openness have been summarized as follows:

> ... generally, to assure the public that justice is done even-handedly and fairly; to discourage perjury and the misconduct of participants; to prevent decisions based on secret bias or partiality; to prevent individuals from feeling that the law should be taken into the hands of private citizens; to satisfy the natural desire to see justice done; to provide for community catharsis; to promote public confidence in government and assurance that the system of judicial remedy does in fact work; to promote the stability of government by allowing access to its workings, thus assuring citizens that government and the courts are worthy of their continued loyalty and support; to promote an understanding of our system of government and courts.

*Commonwealth v. Fenstermaker, supra,* 530 A.2d at 417, *citing Richmond Newspapers, Inc. v. Virginia, supra and Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The openness of criminal trials and the purposes which this openness is intended to serve, are protected not only by tradition, but by provisions in both the United States and the Pennsylvania Constitutions as well. *See* U.S. Const. Amend. 1; U.S. Const. Amend. 6; U.S. Const. Amend. 14; Pa. Const. Art. 1, sec. 7; Pa. Const. Art. 1, sec. 9; Pa. Const. Art. 1, sec. 11.

In the instant case, appellant only raised a federal Sixth Amendment claim at trial. He has waived any separate claims under other provisions of the United States or Pennsylvania Constitutions relating to the right to a public trial. In noting this fact we do not imply that other constitutional provisions would be construed to provide different protec-

tion or require different analysis. Rather, we merely note that the issue preserved and the analysis which follows are limited to the consideration of appellant's Sixth Amendment rights.

In *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the United States Supreme Court noted the particular interests of criminal defendants which the openness of criminal proceedings mandated by the Sixth Amendment was designed to protect:

The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.... 

In addition to ensuring the judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.

467 U.S. at 46, 104 S.Ct. at 2215, 81 L.Ed.2d at 38. The Supreme Court stated further that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and the public." *Id.*

Though the right to an open public trial is central to our system of criminal justice, the right is not absolute. In *Waller v. Georgia, supra,* the Supreme Court explained:

The right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care.

467 U.S. at 45, 104 S.Ct. at 2215, 81 L.Ed.2d at 38.

Courts have generally held that limitations on public access to criminal proceedings may also be justified by: courtroom capacity limitations; the need to preserve order and decorum; the need to protect victims, witnesses, or jurors from serious embarrassment, trauma or intimidation;

and, the need to protect youthful spectators from exposure to testimony which might shock, distress, or tend to corrupt morals. *See Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510–12 & n. 10, 104 S.Ct. 819, 824–25 & n. 10, 78 L.Ed.2d 629, 638–39 & n. 10 (1984) (serious embarrassment of jurors during *voir dire* ); *Richmond Newspapers, Inc. v. Virginia, supra,* 448 U.S. at 600 & n. 5, 100 S.Ct. at 2840 & n. 5, 65 L.Ed.2d at 1005 & n. 5 (capacity limitations, serious embarrassment of youthful victim of a sex crime); *Gannett Co. v. DePasquale, supra,* 443 U.S. at 388 n. 19, 99 S.Ct. at 2910 n. 19, 61 L.Ed.2d at 626 n. 19 (serious trauma, embarrassment or intimidation of adult or juvenile witnesses or victims; juvenile spectators; order and decorum); *Commonwealth v. Berrigan,* 509 Pa. 118, 128–33, 501 A.2d 226, 232–34 (1985) (courtroom capacity; juror intimidation; order and decorum); *Commonwealth v. Knight, supra,* 364 A.2d at 906 & nn. 6–9 (trauma to child witness, order and decorum, juvenile spectators); *Commonwealth v. Burton,* 459 Pa. 550, 557–59, 330 A.2d 833, 837 (1975) (intimidation of an adult witness); *Commonwealth v. Trinkle,* 279 Pa. 564, 569–71, 124 A. 191, 193 (1924) (capacity of temporary courtroom at witness' sick bed).[1]

1. *See also Commonwealth v. Howard,* 324 Pa.Super. 443, 449–56, 471 A.2d 1239, 1242–45 (1984) (order and decorum, intimidation of jurors and witnesses, general security); *Commonwealth v. Smith,* 280 Pa.Super. 222, 224–25, 421 A.2d 693, 694 (1980) (*dicta,* embarrassment, trauma of rape victim); *Commonwealth v. Wright, supra,* 388 A.2d at 1086 (embarrassment, trauma of adult rape victim, intimidation of witnesses); *Commonwealth v. Hodge,* 246 Pa.Super. 71, 78, 369 A.2d 815, 819 (1977) (*dicta,* voluntary removal of high school students to minimize trauma to adult rape victim and protect the sensibilities of juvenile spectators); *Commonwealth v. Stevens,* 237 Pa.Super. 457, ——, 352 A.2d 509, 514 (1975) (embarrassment, trauma of adult rape victim), *Commonwealth ex rel. Paylor v. Cavell,* 185 Pa.Super. 176, 182, 138 A.2d 246, 249 (1958) *cert. denied* 358 U.S. 854, 79 S.Ct. 84, 3 L.Ed.2d 88 (1958) (*dicta,* courtroom capacity, juvenile spectators); Annotation, *Exclusion of Public from State Criminal Trial In Order to Avoid Intimidation of Witness,* 55 A.L.R.4th 1196 (1987 & 1988 Supp.); Annotation, *Exclusion of Public From State Criminal Trial In Order to Prevent Disturbance By Spectators or Defendant,* 55 A.L.R.4th 1170 (1987 & 1988 Supp.); Annotation, *Federal Constitutional Right To A Public Trial In Criminal Case—Federal Cases,* 61 L.Ed.2d 1018 (1980 & 1988 Supp).

■ This case involves an order which directed the court to be cleared during the testimony of a witness who was reported to have claimed that he was intimidated by unnamed persons who sought to prevent or alter his testimony against appellant. In appropriate cases, full or partial closure of criminal proceedings may properly be granted in response to witness intimidation. *See Gannett Co. v. De-Pasquale, supra,* 443 U.S. at 388 n. 19, 99 S.Ct. at 2910 n. 19, 61 L.Ed.2d at 626 n. 19 (collecting cases); *Commonwealth v. Berrigan, supra,* 501 A.2d at 232 (intimidation of jurors during *voir dire*); *Commonwealth v. Burton, supra,* 330 A.2d at 837 (defendant's wife and other identified spectators were removed during the testimony of a particular witness to prevent intimidation); *Commonwealth v. Principatti,* 260 Pa. 587, 598, 104 A. 53, 57–58 (1918) (trial court was held to have erred in holding that it had no power to clear the court during testimony of witness who feared intimidation and retaliation); *Commonwealth v. Wright, supra,* 388 A.2d at 1086 (courtroom was properly cleared during cross-examination of a visibly traumatized rape victim who had been threatened by members of the defendant's family).

Witness intimidation and retaliation against witnesses are serious crimes which the Commonwealth has clear interest in deterring, detecting, and sanctioning. First and foremost, the Commonwealth has an interest in protecting its citizens from intimidation and injury by criminal conduct. Second, the Commonwealth also has an interest in protecting victims and witnesses from intimidation or retaliation because of the indispensable role they play in the operation of the justice system. In *NLRB v. Indiana & M.E. Co.,* 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579 (1942), Justice Robert H. Jackson forcefully admonished:

The influence of lawless force directed toward parties or witnesses to proceedings during their pendency is so sinister and undermining of the process of adjudication itself that no court should regard it with indifference or shelter it from exposure and inquiry.

318 U.S. at 29, 63 S.Ct. at 405, 87 L.Ed. at 592. Succinctly, if the means of justice are to be preserved and the ends of justice protected, courts must exercise their discretion so as to dispel any belief that intimidation of victims or witnesses will serve the ends to which the intimidation is directed.

Studies in the early part of this decade revealed that witness intimidation was more prevalent and more disruptive of the administration of criminal justice than had generally been assumed. *See* Connick & Davis, *Examining the Problem of Witness Intimidation,* 66 Judicature 438, 438–46 (1983); *see also* Hudson, *The Crime Victim and the Criminal Justice System: Time For A Change,* 11 Pepperdine L.Rev. 23, 52–55 (1984). Results of studies in various jurisdictions indicated that from 8% to 48% of all complaining witnesses had been subjected to some form of intimidation by the defendant or someone acting on the defendant's behalf. The studies also revealed that while most witnesses who reported intimidation attempts found the official response helpful, many felt that the response was nonetheless inadequate. Connick & Davis, *supra,* 66 Judicature at 45. One New York study disclosed that even after prior intimidation had been reported, 22% of the victims were again subjected to intimidation; the rate was even higher when, as here, the defendant and the witness knew each other prior to the offense pending before the court (30% versus 12% where the witness and the defendant were strangers to each other). *Id.*

In 1980 (shortly before the studies discussed above had been reported), Pennsylvania enacted new statutory provisions designed to empower the criminal justice system to respond more effectively to the problem of witness intimidation. *See* 18 Pa.C.S.A. §§ 4951–4956. The basic components of the new provisions were: the regrading of many forms of intimidation as a third degree felony (rather than a simple misdemeanor); providing for protective orders and contempt powers to enforce such orders; and, providing that, any pre-trial release must include conspicuous notice that the terms of the release include, as a matter of law, a

condition that the defendant neither do, cause to be done, nor permit to be done any act of intimidation or retaliation against the victim or any witness to the crime charged against the defendant who had been granted the pre-trial release. This Commonwealth has thus expressly recognized its vital interest in deterring, detecting, and sanctioning attempts to intimidate victims and witnesses.[2]

■ However, a bald assertion of alleged intimidation does not justify the kind of encroachment on a defendant's Sixth Amendment right to a public trial which clearing the courtroom for a witness' testimony entails. To the contrary, specific procedures designed to ensure a proper balancing of competing interests must be followed before even a partial closure for a single witness' testimony may be ordered. In *Waller v. Georgia, supra,* the Supreme Court held *unanimously* that:

"The presumption of openness may be overcome only by an overriding interest based on findings that closure is

**2.** We note, however, the following sober assessment of such reforms by Paul Hudson of the New York State Crime Victim's Board:

A model statute prepared and issued by the American Bar Association in 1980 has provided the guidance for new legislation enacted in seven states and by the federal government. While the enactments are too recent for any studies to be completed on the effect of these reforms, at least one study done in the New York City court system in 1981 indicates that much more than a new statute will be required. This study indicates the need for higher penalties, admonishments, orders of protection, bail revocations, relocation services, security of waiting areas and, most importantly, prosecution and investigation of reported intimidation on a systematic basis. Present levels of prosecution are so low, and response of many police agencies to reported threats is so inadequate (i.e., nothing can be done unless a crime is committed or until the defendant takes overt action to carry out his threats), that major efforts by the criminal justice system would be required to restore a sense of deterrence in criminal defendants and a sense of confidence in victims.

Hudson, *supra,* 11 Pepperdine L.Rev. at 54–55 (footnotes omitted). Victim intimidation arrest statistics are not reported separately in Pennsylvania's annual Uniform Crime Report; moreover, we have been unable to discover any statistical account of the numbers of protective orders entered or pre-trial release revocations ordered relating to witness intimidation since the 1980 reforms were enacted. Only three appellate decisions have been reported relating to the provisions, an indication, perhaps, that they are *underemployed.*

essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

467 U.S. at 45, 104 S.Ct. at 2215, 81 L.Ed.2d at 36, *quoting Press Enterprise Co. v. Superior Court, supra,* 464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed.2d at 638.

■ In the instant case, the trial court made no findings whatsoever regarding the nature, extent, or impact of the alleged intimidation on Mr. Reed. Rather than questioning Mr. Reed himself, the trial court relied entirely on the prosecutor's second-hand, hearsay, rendition of the allegations made by Mr. Reed in explanation of his failure to comply with the court's subpoena. Indeed, the trial court specifically stated:

Let me say this for the record. The Sixth Amendment in my legal opinion, and I so find, the Sixth Amendment, the right to an open trial, has to give way in a situation *where a witness claims he was threatened.*

*I can't determine whether or not he is actually threatened right now, and if he was by whom,* but I have to give weight to that kind of statement because we cannot have any witness hurt or have his family threatened or hurt and then later we find that we should have done something.

I believe the Sixth Amendment right has a limitation as to the safety of the family and/or the witness involved.

(N.T. 9/10/86 at 93). (Emphasis added).

We find that the trial court abused its discretion in failing to examine Mr. Reed for itself, *in camera* if necessary, in order to access his credibility and to determine the nature, extent, and impact of any attempts to intimidate Mr. Reed and prevent or alter his testimony, or to otherwise make specific factual determinations based upon sufficiently reliable information which would support a conclusion that important interests existed which would justify the partial closure ordered. While the right to a public trial may

certainly bow to interests in protecting witnesses from injury or intimidation in *some* cases, such an encroachment on a defendant's rights requires, *at a minimum*, that the trial court first determine whether or not the threat of injury or intimidation in fact exists. *See Waller v. Georgia, supra.*

■ Likewise, we find that the trial court abused its discretion in failing to consider alternatives to closure and explain on the record why alternatives would be impractical or inadequate to serve the interest(s) that closure of the trial during Mr. Reed's testimony was intended to protect. *See Commonwealth v. Buehl,* 316 Pa.Super. 215, 226, 462 A.2d 1316, 1322 (1983). In the instant case, the trial court failed entirely to explain why ordinary or augmented courtroom security measures would not be sufficient to ensure Mr. Reed's safety while he testified in open court, or how closure of the court during his testimony would protect Mr. Reed or his children from retaliation outside of the courtroom.

■ Closure of the courtroom to the public is not the only, nor necessarily the most effective, response to victim intimidation. In response to reports of intimidation a trial court may, among other options: act to have the parties involved identified and prosecuted; enter appropriate protective orders; issue appropriate admonitions to the defendant and any courtroom spectators regarding applicable criminal sanctions as well as the court's contempt powers which would be invoked in response to any attempt to injure or intimidate a witness; and, direct that appropriate security measures be taken to ensure safety within the courthouse.[3] While deference to law enforcement personnel with

3. *See generally* 18 Pa.C.S.A. §§ 4951–4956; Connick & Davis, *supra,* 66 Judicature at 438–46; Hudson, *supra,* 11 Pepperdine L.R. at 52–55. With respect to court security measures, we note that Philadelphia courts have recently began using metal detectors to keep weapons out of courtrooms; metal detectors used at the federal courthouse in Philadelphia led to the seizure of 5,600 weapons in the past four years. *See* Locy, "5600 Weapons Seized in Court Over 4 Years," *Philadelphia Daily News,* at 8 (April 11, 1989); *see generally* Mallory, *Order in the*

expertise and experience in witness protection would certainly be appropriate in making findings as to what measures are necessary in a particular case to ensure the safety of a witness and to protect a witness from intimidation, closure of the courtroom, nevertheless, should remain the *last* option considered or employed.

As indicated above, we are well aware of the Commonwealth's vital interests in protecting the safety of witnesses and ensuring the integrity of the criminal justice system. Our conclusion that closure of the court in this case was improper is in no way intended to minimize those interests or suggest that full or partial closure as to some or all members of the public would not be appropriate in response to victim or witness intimidation in other cases. To the contrary, there are certainly circumstances where such drastic measures may be *necessary*, and therefore constitutionally permissible.[4] We simply hold that in the instant case the findings required to justify such an order were not made.[5]

Court: *Keeping our Courtrooms Safe*, 11 Pa.Lawyer 10, 10–16 (March 1989) (discussing court security throughout the Commonwealth).

**4.** Such measures, of course, should be taken in the manner least likely to arouse prejudice against the defendant from the jury. Indeed, the concurring opinion of Justice Roberts in *Commonwealth v. Contakos, supra* (joined by Chief Justice O'Brien), appears to be focussed on the prejudicial effects of the "abrupt exclusion" of the public, rather than any question as to whether the interests in protecting the witness were "compelling" or whether the partial closure was "necessary". 453 A.2d at 582. It may be that declaration of a mistrial is the steep but unavoidable price of witness protection when the only means adequate to ensure the safety of a witness would create a substantial likelihood of undue prejudice to the defendant. However, the risk of such prejudice may and should be avoided and/or minimized in many cases. For example, removals, protective orders, and admonitions often may be made out of the hearing of the jury, either before a session starts or during a brief recess called for that purpose.

**5.** Some federal courts have held that a "substantial" interest rather than a "compelling" interest is all that is constitutionally required to justify a "partial" closure of proceedings, *i.e.* for the testimony of one of several witnesses, as opposed to the "complete" closure of a proceeding as in *Waller v. Georgia, supra. See United States v. Sherlock,* 865 F.2d 1069, 1976–77 (9th Cir.1989); *Douglas v. Wainwright,* 739 F.2d 531, 533 (11th Cir.1984), *cert. denied* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). Our Supreme Court has not framed its

The denial of a defendant's Sixth Amendment right to an open public trial during the testimony of a Commonwealth witness at trial requires reversal and remand for a new trial. *See Waller v. Georgia, supra,* 467 U.S. at 49–50, 104 S.Ct. at 2217, 81 L.Ed.2d at 40–41; *Commonwealth v. Contakos, supra,* 453 A.2d at 582 (per Flaherty, J; Larsen, J, joined); *id.* (per Roberts, J; O'Brien, C.J, joined); *Commonwealth v. Knight, supra,* 364 A.2d at 906; *Commonwealth v. Johnson,* 309 Pa.Super. 367, 376, 455 A.2d 654, 658 (1982). *But see Waller v. Georgia, supra,* 467 U.S. at 49–50, 104 S.Ct. at 2217, 81 L.Ed.2d at 40–41 (a new *trial* is not automatically required for improper closure of a *suppression hearing,* rather a new open suppression hearing must be held, and a new trial will be granted only if the new *open* suppression hearing results in the suppression of evidence not suppressed in the *closed* hearing which might reasonably have altered the outcome at trial); *Commonwealth v. Murray, supra,* 502 A.2d at 629–31 (despite improper closure of the *preliminary hearing* neither a new trial nor a new preliminary hearing were required; rather, the defect was cure by a fair and open trial, and the availability of an interlocutory appeal would prevent repetition of the error in subsequent proceedings).[6]

analysis in terms of "substantial" versus "compelling" interests; rather, our Supreme Court has focused more generally on whether the trial court "abused its discretion" in determining that "important" interests justified the restrictions imposed. *See Commonwealth v. Berrigan, supra,* 501 A.2d at 234 n. 10 (also narrowly construing *Commonwealth v. Contakos, supra* ). We find that while protecting witnesses from intimidation is plainly a vital interest, the trial court's failure to make necessary finding with respect to the fact, nature, and extent of the intimidation and the adequacy of alternatives, renders any distinction between "compelling," "important," or "substantial" interests moot in this case. *Cf. Commonwealth v. Murray,* 348 Pa.Super. 439, 449–50, 502 A.2d 624, 629 (1985) (*dicta,* a "compelling interest is required").

**6.** We note that a fundamental difference exists between the posture of this case and that of *Commonwealth v. Smith,* 280 Pa.Super. 222, 421 A.2d 693 (1980), wherein this Court noted the existence of a plausible justification for the closure order challenged, and remanded for a hearing to enable the parties and the trial court to supplement the record. In *Smith,* this Court found remand necessary to cure ambiguities and to fill omissions in the official record as to what had

148

## Conclusion

Based upon the foregoing, judgment of sentence is reversed and the case is remanded for a new trial. Jurisdiction relinquished.

occurred in the trial court, *i.e.* what were the precise terms of the closure, what objections were made, and how did the closure order actually effect the openness of proceedings (who was removed or barred and for how long). Nothing in the remand directive issued in *Smith* implied an opportunity to *cure* a failure to make findings necessary to justify closure. To the contrary, this Court held explicitly in *Commonwealth v. Buehl, supra,* that *post hoc* justifications for closure orders are not sufficient to cure a trial court's failure to make express findings sufficient to support the closure order at the time of its original entry. 462 A.2d at 1323; *see also Commonwealth v. Murray, supra,* 502 A.2d at 629 & n. 5. In *Smith,* the record was not clear as to what exactly transpired in the trial court; here, on the other hand, the record is complete and the relevant facts are clear. Hence, remand for clarification, as in *Smith,* is not required.