NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  15-2170
_____

TERRANCE TUCKER

v.

SUPERINTENDENT GRATERFORD SCI,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-11-cv-00966)
District Judge: Honorable James Knoll Gardner
_____

Argued: June 7, 2016

Before: CHAGARES, KRAUSE, and SCIRICA,  Circuit Judges

(Filed: February 3, 2017)

Susan E. Affronti
Ryan Dunlavey    [ARGUED]
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA  19107
        *Counsel for Appellant*

Arianna J. Freeman
Thomas C. Gaeta     [ARGUED]
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106
        *Counsel for Appellee*

_____

OPINION[*]

_____

SCIRICA, *Circuit Judge*.

Petitioner Terrance Tucker contends in this habeas corpus petition that he was

denied effective assistance of counsel because his counsel on direct appeal did not raise

the potential claim that Tucker's Sixth Amendment right to a public trial was infringed

during his state-court trial. The United States District Court for the Eastern District of

Pennsylvania granted Tucker's habeas petition, finding the Superior Court of

Pennsylvania had unreasonably applied Supreme Court precedent, and ordered the

Commonwealth of Pennsylvania to release Tucker or grant him a new trial. The

Commonwealth appealed. We will reverse and remand for proceedings consistent with

this opinion.

## I.

### A.

The charges against Tucker stem from the February 20, 2002 homicide of Mikal

Scott. Scott provided statements to police against two members of a rival gang during a

prior murder investigation in 2000, but recanted his statement prior to trial. According to

---

[*] This disposition is not an opinion of the full Court and does not constitute binding precedent. I.O.P. 5.7

the Commonwealth's theory of the case and evidence adduced at trial, in retaliation for Scott recanting his statement, Tucker and a co-conspirator shot and killed Scott.

B.

The Commonwealth charged Tucker with murder and several other offenses. His trial in the Court of Common Pleas of Philadelphia County began on November 12, 2003. J.A. 87. After holding an off-the-record discussion with counsel in chambers, the trial judge closed the courtroom to the public. The judge said, "I have determined that I am going to close the courtroom for the balance of this proceeding. No citizens will be permitted to observe this trial until I decide otherwise." *Id.* at 182. The judge gave two reasons for closing the courtroom—courtroom disruptions and witness tampering and intimidation.

> As to the first reason, the judge explained:
>
> During the beginning instructions I noticed many, many citizens coming into the courtroom whose behavior was not cooperative. They were attempting to talk to Mr. Tucker. Mr. Tucker was attempting to communicate with them at points in time when [defense counsel] was focused on the jury, and to such a degree that I had to have a message sent to [defense counsel] to have Mr. Tucker stop.

*Id.* Earlier that day, the judge had twice admonished Tucker's father and other people in the gallery for disrupting the trial by speaking to Tucker. *Id.* at 166, 171. Despite these admonishments to the gallery, the judge also had to instruct Tucker to "face forward" so spectators could not communicate with him. *Id.* at 182. The judge was concerned not only with the uncooperative behavior of Tucker, his father, and other spectators, but also

3

with the "exceedingly complex" relationships among the witnesses scheduled to testify on behalf of the Commonwealth and Tucker,[1] and how that complexity might affect the orderly administration of trial. *Id.* at 183. Closing the courtroom would prevent disruption and keep witness testimony as "pristine as possible . . . so that the jury has a clean record with which to work." *Id.* As the Superior Court of Pennsylvania later added, "[closure was] particularly [appropriate] since this case had its genesis in a gang-related dispute." *Id.* at 58.

As to the second reason for closing the courtroom—witness tampering and intimidation—the trial judge explained that "[the court had] previously documented in this record that there may have been attempts at witness tampering." *Id.* at 182. Specifically, an eyewitness to the murder, Tonaysha Austin,[2] failed to appear on the first scheduled day of trial because, as the Commonwealth's attorney explained during the pretrial colloquy, one of Austin's relatives who had recently been in jail with Tucker, and "who she would not identify . . . because she was scared," had given her a message from Tucker.[3] *Id.* at 168. Tucker allegedly told Austin's relative to tell her that "if [Austin] comes to court that she shouldn't say he was the one that did it because he wasn't the one

---

[1] For example, Naima Scott—the sister of Mikal Scott—was also the cousin of Damon Walls, who was involved in the prior homicide in 2000. *See* J.A. 297.

[2] Austin had been seated in the car behind Scott when he was shot, and had been with Tucker earlier that day.

[3] These incidents of witness tampering impeded the administration of the trial. Because Austin failed to appear on the first day of trial, the trial had to be postponed to Wednesday of that week. J.A. 167.

who did it." *Id.* The Commonwealth acknowledged this threat was "oblique," *id.*, but because Austin was "afraid about coming to testify" and "concerned about herself, her family, and . . . this relative," the Commonwealth placed her in a hotel "out of Philadelphia" for "her to feel like she [was] going to be safe," *id.* at 169. In her testimony at Tucker's trial, Austin expressed she was still "scared" "to be in the room with [Tucker]." *Id.* at 197.[4]

Tucker's attorney objected to the closure. *Id.* at 183. The trial judge overruled the objection, but stated the issue was preserved for review. *Id.* The jury heard testimony from fourteen witnesses over the course of three days. Aside from Austin, who testified on the first and second days of trial, the other testifying witnesses were Anne Williams (another eyewitness), *id.* at 259, a medical examiner, *id.* at 291, two detectives, *id.* at 236, 239–240, four police officers, *id.* at 246, 253, 309–10, 316–17, and Tucker's prior counsel, *id.* at 304. Scott's sister also testified, *id.* at 296, as did three witnesses for Tucker during the second half of the third day of witness testimony, *id.* at 322, 327, 330–31.

---

[4] The Commonwealth also alleged, and evidence supports, that Austin failed to appear at the preliminary hearing because she was influenced by a friend of Tucker's. When asked at the preliminary hearing if she was threatened not to come, Austin responded "Amir Muhammed told me that if I didn't come to Court three times that it would be all thrown out." *Id.* at 308. When pressed on this at Tucker's trial, Austin testified that prior to the preliminary hearing, Muhammed, the brother of Isa Muhammed and a friend of Tucker's, took Austin to see a lawyer. *Id.* at 196. "Muhammed went into the room to talk to the lawyer while [Austin] was sitting outside waiting for him to finish. Then he came back out and he told me if I don't come to court three times that it will be dismissed." *Id.*

Although the record is unclear, it appears the courtroom was not entirely closed during the entirety of witness testimony. On the first day of witness testimony, during the first half of Austin's direct examination, there was a detective in the courtroom who was on another case as well as an intern for the Commonwealth. *Id.* at 185. The intern, who we do not consider a member of the public, was allowed to stay, but the detective was asked to leave for the remainder of Austin's direct examination and the first half of her cross examination. *Id.* at 198. At the start of the second day, which continued with Austin's cross examination, the trial judge noted that her friend, a professor from Drexel University, and her students were in attendance, taking notes. *Id.* at 227. It is unclear from the record how long they stayed. It is also unclear whether any members of the public were present during the third day of witness testimony.

Once witness testimony had concluded, the trial judge reopened the rest of the proceedings to the public.[5] *Id.* at 333. On November 19, 2003, the jury found Tucker guilty of third-degree murder, possessing an instrument of crime, reckless endangerment, and criminal conspiracy. *Id.* at 378. He was sentenced to an aggregate prison term of thirty to sixty years. *Id.* at 519.

---

[5] The trial court judge initially only contemplated letting the mothers of the victim and defendant in, but explained that she "[didn't] know who Mr. Tucker's mother [was] because so many people were trying to get into the courtroom" and "[d]ifferent people kept claiming that they were [Tucker's] mom. All kinds of people claimed to be [Tucker's] mom." J.A. 333.

C.

Tucker appealed his conviction and sentence to the Superior Court of Pennsylvania. Tucker, represented on appeal by his trial counsel, raised six challenges,[6] but did not challenge the courtroom closure. *Id.* at 806–07. Tucker's conviction and sentence were affirmed, *id.* at 73–84, and the Supreme Court of Pennsylvania denied review, *Commonwealth v. Tucker*, 911 A.2d 935 (Pa. 2006) (table).

Tucker filed a petition for collateral relief under the Pennsylvania Post-Conviction Relief Act (PCRA) in the Court of Common Pleas of Philadelphia County. J.A. 768. Among various ineffectiveness claims, Tucker claimed his appellate counsel was ineffective for failing to challenge the courtroom closure. *Id.* at 772. The closure, he contended, violated his Sixth Amendment right to a public trial because it failed to pass the standard set by the Supreme Court of the United States in *Waller v. Georgia*, 467 U.S. 39, 45 (1984). *Id.* at 772–75. The PCRA court denied Tucker's petition, explaining the trial court's reasoning for not closing the courtroom as follows:

> This case grew out of a dispute between two rival gangs. It was preceded by at least two other murders. The relationship between these groups was

---

[6] On direct appeal, Tucker alleged:

> (1) the trial court erred in admitting hearsay testimony to establish a motive; (2) the trial court erred in limiting the cross-examination of a prosecution witness; (3) the trial court erred in admitting hearsay testimony; (4) the trial court erred in permitting the court reporter to read back portions of testimony; (5) the evidence of third-degree murder and conspiracy was insufficient; and (6) the trial court failed to consider Tucker's background during sentencing and failed to adequately explain the length of the sentence.

J.A. 28 (citing Direct Appeal Op. at 4–5).

complex and not completely clear. It involved documented violent incidents of witness intimidation and retaliation. During opening statements a large group of young men entered the courtroom and attempted quite obviously to have inappropriate contact with [Tucker], who also attempted to communicate with the people in the courtroom. As a result, both counsel were advised of the necessity to close the courtroom in order to preserve the sanctity of the proceedings.

*Id.* at 68 (internal citations to the trial record omitted).[7]

On appeal, the Superior Court of Pennsylvania affirmed the PCRA order, citing the above language. *Id.* at 58. Instead of applying the *Waller* test, however, it analyzed the legality of the closure under a state-law standard, and found the closure permissible. *Id.* at 57–59. Accordingly, the Superior Court of Pennsylvania held Tucker's appellate counsel was not ineffective. *Id.* The Supreme Court of Pennsylvania again denied review. *Commonwealth v. Tucker*, 8 A.3d 345 (Pa. 2010) (table).

D.

Tucker reasserted his ineffective assistance claim in a timely habeas petition. *See* 28 U.S.C. § 2254; J.A. 569, 646. A Magistrate Judge recommended Tucker's "petition be denied as meritless." J.A. 26. He found the decision to close the courtroom justified under *Waller*, because "[a]s the trial court found, many spectators attempted to communicate with Tucker during opening statements," and "[t]here had been documented concerns of

---

[7] Judge Renee Caldwell Hughes presided over Tucker's initial trial and the PCRA trial. This is common practice in the Pennsylvania courts. *See Lambert v. Blackwell*, 387 F.3d 210, 229 n.13 (3d Cir. 2004); *Commonwealth v. Ligons*, 971 A.2d 1125, 1140 (Pa. 2009) (noting in passing "that the PCRA judge . . . [is] oftentimes . . . the same judge who presided over the petitioner's trial").

witness intimidation earlier in the case, and the relationships between Tucker, the decedent, and various witnesses were complex." *Id.* at 36.

The District Court disagreed with the Magistrate Judge's *Waller* analysis, declined to adopt his recommendation, and issued a writ of habeas corpus, ordering the Commonwealth to either release Tucker or grant him a new trial. *Tucker v. Wenerowicz*, 98 F. Supp. 3d 760, 781 (E.D. Pa. 2015). The court reasoned the courtroom closure violated the rule announced by the Supreme Court of the United States in *Waller*, *see id.* at 765–66, and held appellate counsel was ineffective for failing to appeal this "plainly-meritorious claim," *id.* at 779. The Commonwealth appealed. J.A. 1.

## II.[8]

The Commonwealth contends we must reverse the District Court's decision because the Superior Court of Pennsylvania's resolution of Tucker's ineffective assistance claim was not contrary to a clearly established holding of the Supreme Court of the United States. We disagree. The Superior Court applied a standard contrary to established federal law that was less favorable to Tucker in evaluating the underlying courtroom closure claim. However, we nonetheless reverse the order of the District Court granting the petition for a writ of habeas corpus because we conclude, conducting our own *de novo Strickland* review, Tucker has failed to meet his burden of demonstrating a

---

[8] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the District Court's decision to grant Tucker's habeas petition. *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009).

9

reasonable probability that the outcome in his case would have been different but for his counsel's failure to raise the closure issue on appeal.

A.

Because Tucker's ineffective assistance claim was adjudicated on the merits by the Superior Court of Pennsylvania, it is subject to the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214 ("AEDPA"). Under AEDPA, habeas relief is unavailable unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Tucker does not contend the Superior Court's decision was factually erroneous. Instead, he contends, as framed by the District Court, it involved an "unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984)"—the Supreme Court case addressing ineffective assistance of counsel claims—"vis-à-vis *Waller v. Georgia*, 467 U.S. 39 (1984)." *Tucker*, 98 F. Supp. 3d at 765.

A decision by a state court is "contrary to . . . clearly established law if it applies a rule that contradicts the governing law set forth" in Supreme Court precedent. *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quotations and citations omitted). A state court need not have cited any particular Supreme Court decisions, and this standard affords considerable latitude to the state court, "so long as *neither the reasoning nor the result* of the state-court decision contradicts" federal law. *Early v. Packer*, 537 U.S. 3, 8 (2002)

10

(per curiam) (emphasis added). In this regard, the state court's decision need not even be accompanied by an explanation, as long as there was a "reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

However, "when the state court pens a clear, reasoned opinion, federal habeas courts may not speculate as to theories that 'could have supported' the state court's decision." *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 283 (3d Cir. 2016) (en banc). If a state court does provide reasoning, the state court decision is not entitled to deference if no "fairminded jurist[]" could "disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Richter*, 562 U.S. at 102. The state court may not add or remove a factor from a clearly established federal law test. *Dennis*, 834 F.3d at 307 (concluding that adding an admissibility requirement to Fourteenth Amendment *Brady* inquiry constituted "an unreasonable application of" and was "contrary to" clearly established federal law); *see also Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002) ("The addition, deletion, or alteration of a factor in a test established by the Supreme Court . . . constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA.").

## B.

The federal claim here is an ineffective assistance of counsel claim, which requires a defendant to establish (1) constitutionally deficient representation, and (2) resulting prejudice. *Strickland*, 466 U.S. at 687. The ineffective assistance of counsel claim serves as the vehicle for the actual error alleged—the Superior Court of Pennsylvania's analysis

11

of whether there was a violation of Tucker's Sixth Amendment right to a public trial under Supreme Court precedent. The Superior Court engaged in a Sixth Amendment analysis when determining whether Tucker's counsel constitutionally erred by not appealing the courtroom closure, and concluded that because there was no viable Sixth Amendment claim to appeal, Tucker's appellate counsel could not have been deficient in choosing not to appeal it.

Under Supreme Court precedent, closing a courtroom is permissible only if the following requirements are met: (1) there is "an overriding interest that is likely to be prejudiced," (2) the closure is "no broader than necessary to protect that interest," (3) the trial court considers "reasonable alternatives" to closure, and (4) the trial court makes "findings adequate to support the closure." *Waller*, 467 U.S. at 48.[9]

The Superior Court of Pennsylvania did not apply *Waller*, but instead applied a less rigorous standard from *Commonwealth v. Berrigan*, 501 A.2d 226 (Pa. 1985). Under this standard, "[w]here trial courts perceive a threat to the orderly administration of

---

[9] On appeal, the Commonwealth contends for the first time that *Waller* does not apply because the closure was "partial" rather than "complete." *See* Appellant's Br. 44–45. Whether a closure is complete or partial "depends not on how long a trial is closed, but rather who is excluded during the period of time in question." *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013). While not without doubt, the facts of *Thompson* are sufficiently distinguishable that we do not address the standard articulated in that case for reviewing partial closures. *Thompson* involved a closure limited only to defendant's relatives and only for a single witness's testimony. *Id.* In Tucker's case, the trial judge chose to close the courtroom during the testimony of all witnesses, including the six law enforcement officers who testified, and to all members of the public, save for a detective and a group of students, who were in attendance at the request of a friend of the trial judge.

justice in their courtrooms by an unmanageable public, they may always place reasonable restrictions on access to the courtroom, so long as the basic guarantees of fairness are preserved . . . ." *Berrigan*, 501 A.2d at 234. The Superior Court explained it "is the responsibility of the court to maintain not only the control but also the security of the courtroom," J.A. 672 (citing *Commonwealth v. Pantano*, 836 A.2d 948 (Pa. Super. Ct. 2003)), and that the right to a public trial "serves two purposes: (1) it prevents the accused from being subject to a Star Chamber proceeding; and (2) assures the public that the standards of fairness are being observed." *Id.* at 682 (citing *Commonwealth v. Constant*, 925 A.2d 810, 817 (Pa. Super. Ct. 2007)).

The standard applied by the Superior Court of Pennsylvania is contrary to *Waller*. Specifically, the Superior Court failed to consider the second, third, and fourth prongs of the *Waller* test. The Superior Court identified an overriding interest that would be prejudiced, specifically "disruption caused by the spectators in the courtroom, particularly since this case had its genesis in a gang-related dispute." *Id.* at 683. However, having identified this interest, the Superior Court concluded its analysis, because "by no means did the trial resemble a proceeding in the Star Chamber and we have a record of the proceedings to review on appeal." *Id.* at 683.

The standard articulated in *Berrigan* that allows "reasonable restrictions" on public access to the courtroom is inconsistent with the narrow tailoring required by *Waller*. The Superior Court did not consider whether the closure was narrowly tailored,

13

whether reasonable alternatives to a complete closure existed,[10] and did not evaluate

whether the trial court's findings on the record justified the scope of the closure. *See*

*Waller*, 467 U.S. at 48. Moreover, the interests identified by the Superior Court and relied

on for its conclusion—preventing "Star Chamber" proceedings and preserving a record

for review—are dramatically narrower than the interests that must be considered under

controlling federal law. *See Waller*, 467 U.S. at 47 (identifying "strong interest" of the

"public in general" in exposing court proceedings to "the salutary effects of public

scrutiny"). Because both prongs of the Superior Court's *Strickland* analysis necessarily

depended on the analysis of the underlying *Waller* claim, the Superior Court's *Strickland*

analysis is an unreasonable application of and contrary to clearly established federal law.

　　We are deeply concerned that Pennsylvania courts, including the Superior Court in

Tucker's case, are not applying *Waller* when analyzing defendants' Sixth Amendment

public-trial claims. In the first few years after *Waller*, two Pennsylvania courts of appeal

concluded the closures in those cases violated the defendant's Sixth Amendment right to

a public trial because the trial courts had failed to make specific findings in support of the

closure as required under *Waller*. *See Commonwealth v. Penn*, 562 A.2d 833, 836–39

(Pa. Super. Ct. 1989); *Commonwealth v. Murray*, 502 A.2d 624, 627–29 (Pa. Super. Ct.

1985). But more recent Pennsylvania decisions, even those with thorough discussions on

---

[10] As discussed *infra*, the trial court may not have had a clearly established duty to consider alternatives *sua sponte*, but the Superior Court failed to even address this clear *Waller* requirement.

14

closure, have reverted to Pennsylvania's less rigorous *Berrigan* standard. *See, e.g.*,

*Commonwealth v. Tirado*, No. 3088 EDA 2010, 2013 WL 11259149, at \*2 (Pa. Super.

Ct. July 12, 2013) (applying *Berrigan* in a Sixth Amendment public-trial challenge);

*Commonwealth v. Constant*, 925 A.2d 810, 817 (Pa. Super. Ct. 2007) (same);

*Commonwealth v. Conde*, 822 A.2d 45, 50 (Pa. Super. Ct. 2003) (same). So too here.

Although Tucker cited and argued *Waller* in both his PCRA petition and in his appellate

brief, the Superior Court of Pennsylvania ignored the *Waller* standard and applied the less

rigorous Pennsylvania standard. J.A. 58 (concluding the trial court did not abuse its

discretion when it closed the courtroom because the trial court was "acutely—and

justifiably—concerned about the disruption caused by the spectators in the courtroom").

Because the Superior Court's *Strickland* analysis turned on an analysis of the right

to a public trial that is inconsistent with *Waller*, § 2254(d)(1) is satisfied and the decision

of the Superior Court is not entitled to AEDPA deference.

## C.

Having determined that the state court decision is not entitled to deference under

AEDPA, we proceed to a *de novo* evaluation of the constitutional claim on the merits.

*Panetti v Quarterman*, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in

§ 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the

deference AEDPA otherwise requires."). As explained previously, Tucker raises a claim

of ineffective assistance of counsel under *Strickland* and thus must establish (1)

constitutionally deficient representation, and (2) resulting prejudice. *Strickland*, 466 U.S.

15

at 687. We may consider the *Strickland* prongs in either order, and we have observed that "it is often practical to consider the prejudice prong first." *United States v. Fazio*, 795 F.3d 421, 426 (3d Cir. 2015). To demonstrate prejudice, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In this case, to establish prejudice, Tucker must establish that but for his counsel's failure to raise the courtroom closure claim on direct appeal, the outcome of his appeal would have been different. Thus, Tucker must demonstrate that the underlying *Waller* claim would have had a reasonable probability of success—"sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The "mere possibility" that the outcome would have been different is not sufficient to establish *Strickland* prejudice. *Rountree v. Balicki*, 640 F.3d 530, 538 (3d Cir. 2011). Tucker has not met this burden.

Under the first prong of *Waller*, the interests cited by the trial judge—maintaining order and preventing witness intimidation and tampering—were overriding. *See Codispoti v. Pennsylvania*, 418 U.S. 506, 514 (1974) ("[C]ases in this Court have consistently . . . . [recognized] the need to maintain order and a deliberative atmosphere in the courtroom." (internal citation and quotation marks omitted)); *Cox v. Louisiana*, 379 U.S. 559, 562 (1965) ("[I]t is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy."). *See generally* 18 U.S.C. § 1512(b), (d) (federal witness-tampering statute);

16

18 Pa. Stat. & Cons. Stat. Ann. § 4952 (West 2002) (state witness-tampering statute). These interests were likely to be prejudiced in the absence of closure because audience members had already disrupted the trial on multiple occasions. More significantly, Tucker's trial was part of a dispute between two rival gangs that had previously resorted to witness intimidation, and Austin feared testifying after Tucker purportedly threatened her. *See Tucker*, 98 F. Supp. 3d at 776.

On the second prong, the scope of the closure was not overbroad based on adequate findings of fact—as required under the fourth prong of *Waller*. With respect to witness tampering and intimidation, on each day the courtroom was closed, witnesses testified who either had already been tampered with or intimidated, or for whom there was a strong likelihood of tampering or intimidation. Austin testified on days one and two, Anne Williams (another eyewitness who lived in the neighborhood) on day two, and Naima Scott (the sister of the victim) as well as Tucker's witnesses testified on day three. These witnesses had connections to rival gangs and to one another. The trial judge observed on the record that it was impossible to tell who was who in the gallery, particularly because some observers when asked provided obviously false identities. J.A. 333 ("[A]ll these different women kept coming up saying I am his mother . . . ."). In view of these findings by the trial court, even if it is possible that an appellate court could hold that a more specific parsing of the closure throughout the day would have been feasible, we cannot say that there was a reasonable probability that the outcome of the appeal would be different. On the contrary, a reviewing court would likely conclude—given the

17

gang related origins of the case, the number of people involved in the underlying incidents and resulting witness intimidation, the frequent and unexpected disruptions, and the repeated disregard of the trial court's many admonishments to Tucker and the gallery—that the trial court's decision to close the courtroom for the entirety of the witness testimony was not overly broad and was necessary to stymie further witness intimidation and to maintain control of the courtroom.

With respect to the third prong, at the time of Tucker's trial, there was some uncertainty whether this step of the *Waller* test compelled courts to consider reasonable alternatives *sua sponte*, or whether the party opposing closure had to propose them.[11] In 2010, several years after Tucker's trial, the Supreme Court of the United States resolved this possible uncertainty, holding that "trial courts are required to consider alternatives to closure even when they are not offered by the parties . . . ." *Presley v. Georgia*, 558 U.S. 209, 214 (2010).

The trial court no doubt could have been more explicit in considering alternatives to closure on the record. But implicit in the trial court's findings and the observations she made on the record was her consideration and rejection of a number of alternatives, including addressing disruptions as they arose, J.A. 182 (trial judge explaining that her

---

[11] *See, e.g.*, *Ayala v. Speckard*, 131 F.3d 62, 71 (2d Cir. 1997) (en banc) (declining to consider "[w]hether or not a sua sponte obligation exists [under *Waller*] to consider alternatives to complete closure"); *Bell v. Jarvis*, 236 F.3d 149, 169 (4th Cir. 2000) (en banc) (concluding sua sponte consideration was unnecessary in the context of partial closure involving a child abuse victim).

repeated admonishments to the gallery and Tucker had been unsuccessful as they continued "attempting to communicate" with each other to the point that she needed to send defense counsel "a message . . . to have Mr. Tucker stop"), barring particular persons who were disruptive from the courtroom, *id.* at 182-83 (trial court stating that during the opening instructions "many, many citizens [came] into the courtroom whose behavior was not cooperative" and indicating exclusion of only those persons was not feasible due to the "exceedingly complex" relationships among the parties who are related both "by blood, [and] by marriage" and who "live in the same neighborhood together"), and allowing certain non-disruptive persons back into the courtroom, *id.* at 333 (trial court noting it was amenable to allowing Tucker's and victim's mothers back into courtroom but was unable to distinguish among the many women who represented themselves as Tucker's mother). In addition, the trial court's decision to close the courtroom was preceded by an off-the-record discussion with counsel. *Id.* at 182. It is apparent under these circumstances that the trial judge did consider alternatives, and, particularly given the incidents of witness tampering and complicated relationships between the people in the courtroom and the fact that Tucker was charged with the murder of a witness to a prior homicide in an ongoing gang dispute, *id.* at 241-42, she reasonably concluded that none would have alleviated the concerns of witness tampering and courtroom control. *See Presley*, 558 U.S. at 209 ("Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials.").

The fourth prong of *Waller* is satisfied as well. Under the fourth prong, "the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Presley*, 558 U.S. at 215 (quoting *Press-Enterprise Co. v. Super. Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510 (1984)). As outlined above, the trial judge articulated the overriding interests on the record and explained why she decided that a closed trial was the best way to protect those interests. J.A. 182–83. While the trial judge could have been more explicit as to why she rejected alternatives short of a complete closure, the findings are sufficient to determine whether the closure order was properly entered.

We conclude that Tucker has failed to meet his burden of showing that but for the failure of his appellate counsel to raise the *Waller* claim there is a reasonable probability the outcome of his appeal would have been different. For this reason, we will reverse the District Court's order granting Tucker's petition for a writ of habeas corpus and remand for proceedings consistent with this opinion.

20