J-S21042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANTWAIN ROPER | : | |
| | : | |
| Appellant | : | No. 875 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 10, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001715-2020

BEFORE: LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.: **FILED SEPTEMBER 24, 2024**

Antwain Roper (Appellant) appeals from the judgment of sentence entered following his convictions of first-degree murder and possessing an instrument of crime (PIC), and two violations of the Uniform Firearms Act (VUFA)[1]: firearms not to be carried without a license and carrying firearms in public in Philadelphia (collectively, the VUFA violations).[2] We affirm.

The trial court described the facts underlying Appellant's convictions as follows:

> On May 24, 2019, shots were fired in the area of 2525 South 71st Street, [Philadelphia, Pennsylvania,] where police responded and took the victim[,] Naeem Reid [(Reid, victim, or decedent),] to Penn Presbyterian Hospital, where he later died from multiple gunshot wounds. (N.T. 3-7-2023, pp. 46-50). Surveillance

---

[1] *See* 18 Pa.C.S.A. §§ 6101-6128.

[2] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, 907.

[video] showed a silver Infinity fleeing from the scene, [with heavily tinted windows,] and damage to the driver[-]side bumper. Five days later, that silver Infinity was found abandoned at 8500 Gibson Place[, Philadelphia]. (N.T. 3-7-2023, pp. 58-60). Surveillance videos also showed Reid walking down the street … when the silver Infinity drove past heading the other direction[.] [The vehicle] appeared again following Reid's path until it pulled up, [Appellant] exited the vehicle, sho[t] Reid and then got back into the car and fleeing. (N.T. 3-7-2023, pp. 123-147). The vehicle had previously been registered to [Appellant], and although he had changed the registration, evidence indicated that he was still the owner of the vehicle but had changed the registration information to someone whose identity had been stolen. (N.T. 3-9-2023, pp. 11-12, 16-20). [Appellant's] phone [GPS data] also showed that he was in the area of the shooting when it took place, and then immediately after in the area where the car was recovered. (N.T. 3-8-2023, pp. 73-115).

A warrant was executed for [Appellant's] property and an arrest warrant issued. After an incident in the City of Chester, where [Appellant] was apprehended, the vehicle he had been in was searched, and a key fob to an Infinity was found and turned over to Detective [Frank] Mullen, who was conducting the investigation into Reid's murder. (N.T. 3-8-2023, pp. 12-22). The key fob was later determined to be the key to the Infinity that … [was] used in the murder of [] Reid. (N.T. 3-9-2023, pp. 38-39).

Trial Court Opinion, 9/5/23, at 2-3 (paragraph break added).

Police arrested Appellant on September 17, 2009. As the trial court explained,

A jury trial was held from March 6th through the 10th, 2023, with [Appellant] being convicted of murder of the first degree and the remaining charges. Appellant was sentenced to life imprisonment without the possibility of parole for murder, [and] a concurrent two to five years' imprisonment for the remaining charges. Post-sentencing motions were filed and subsequently denied. [Appellant's c]ounsel was permitted to withdraw, and new counsel [was] appointed….

*Id.* at 1.  Appellant timely appealed.[3]  Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

[1.]  Was the evidence presented by the Commonwealth insufficient and against the weight of the evidence regarding the Appellant's convictions for: Murder Of The First Degree []; Firearms Not To Be Carried W[ithout a] License []; Carry[ing] Firearms Public In Phila[delphia] []; and [PIC] …?

[2.] Did the Trial Court improperly admit witness Nicole Wright's [(Ms. Wright)] testimony regarding the poor relationship history and ill will between Appellant and [Reid], at the time of [Reid's] death, where such testimony was based on inadmissible hearsay and was not based on the witness's personal knowledge[?]

[3.]  Is Appellant entitled to a new trial where the Trial Court violated Appellant's Sixth Amendment right to a public trial and committed structural error by precluding Appellant's family from jury selection[,] where the court did not find an overriding interest to enforce a total closure of the courtroom, did not explore[] more reasonable alternatives[,] and failed to place adequate reasoning on the record?

[4.]  Did the Trial Court improperly admit Medical Examiner's photographs D2, D7, D11 and D12[,] where said photographs were timely objected to, were inflammatory and were not of essential evidentiary value, and where D11 had previously been precluded by the Trial Court?

Appellant's Brief at 7-8 (issues reordered).

_____

[3] Although Appellant purportedly appealed from the order denying his post-sentence motions, an appeal actually lies from the judgment of sentence.  ***See Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) ("In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions."  (citation omitted)).  The caption has been changed accordingly.  In addition, this Court has dismissed Appellant's duplicative appeal at No. 1069 EDA 2023.

- 3 -

Appellant first challenges the sufficiency and weight of the evidence underlying his conviction of first-degree murder and his VUFA convictions. *Id.* at 60-61. Appellant argues the evidence is

> entirely circumstantial, is in contradiction to the facts, in contravention to human experience and the laws of nature, [and] as such[,] it is insufficient as a matter of law.

*Id.* at 62. Appellant directs our attention to the eyewitness testimony of Eric Pane (Pane), "who describe[d] the shooter as a black male, 5'6" – 5'8", stocky build, in all black clothing." *Id.* Appellant asserts he does not match the description given by this sole eyewitness. *Id.* Appellant directs our attention to evidence that Pane failed to identify Appellant in a photo lineup or in person. *Id.* at 62-63.

Appellant argues the victim failed to identify Appellant as his assailant prior to his death. *Id.* at 63. Appellant states,

> [t]his is significant in the context of when we consider [Ms.] Wright's testimony that Appellant and [Reid] knew one another, [they] had history[,] and there was ill will at the time of the shooting. Decedent was able to talk to Officer Brown, told [O]fficer Brown he had been shot in the back, [and] apparently knew the Appellant, yet did not identify Appellant as the shooter.

*Id.*

Appellant additionally disputes the cell phone GPS location analysis, arguing it is "confusing, misleading, contradictory to itself and points to an individual other than Appellant as the suspect." *Id.* at 63-64. Appellant points out that the T-Mobile phone numbers ending in 0483 and 1617 are registered to "Michael Davis" (Davis), who lives near the crime scene. *Id.* at 64.

According to Appellant, these phone numbers connected to cell towers within the area where the silver Infinity was abandoned. *Id.* Notwithstanding, Appellant argues, Davis was not investigated as a suspect. *Id.*

Appellant also challenges the Commonwealth's evidence connecting him to the cell phone number ending in 0483. *Id.* Appellant points out that the Commonwealth's evidence "simply places [that phone number] within approximately one square mile of the crime scene, at the time of the shooting, and within two square miles" of the abandoned Infinity. *Id.* According to Appellant, the evidence failed to establish "who is using the phone at the time of the analyzed calls." *Id.* at 64-65.

Appellant directs our attention to another suspect, Damon Holly (Holly). *Id.* at 65. Appellant asserts the silver Infinity was registered to and insured by Holly. *Id.* According to Appellant, although Holly was informed of the possible theft of his identity, he declined to pursue an investigation as to the theft. *Id.* Appellant further asserts Holly was not subjected to DNA testing. *Id.* at 66.

Appellant points out police never recovered the murder weapon. *Id.* at 67. Appellant directs our attention to evidence that the firearm shells and casings

> recovered from Appellant's home were tested and compared against the [shells and casings] recovered at the scene[,] and it was determined they were not from the same gun that was used in Decedent's murder. It was also determined that the gun (never recovered) belonging to the Glock 26 gun box [that police

recovered from Appellant's home] could not have been the murder weapon.

*Id.* at 66-67.

Regarding his VUFA convictions, Appellant argues that the certificate of non-licensure, presented by the Commonwealth, is not sufficient to sustain his convictions. *Id.* at 69. He argues,

> any determination that [Appellant] possessed and/or carried a firearm is entirely circumstantial, is in contradiction to the facts, [and] in contravention to human experience and the laws of nature[;] as such, it is insufficient as a matter of law….

*Id.* Appellant emphasizes police never recovered the murder weapon. *Id.* at 70-71.

Because a determination of evidentiary sufficiency presents a question of law,

> our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Rosario*, 307 A.3d 759, 764-65 (Pa. Super. 2023) (citation omitted).

- 6 -

The Pennsylvania Supreme Court has identified the elements of first-degree murder as follows: "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Commonwealth v. Martin*, 101 A.3d 706, 718 (Pa. 2014) (citing 18 Pa.C.S.A. § 2502(a)). Circumstantial evidence may prove specific intent and malice where a defendant uses a deadly weapon on a vital part of the victim's body. *Commonwealth v. Hicks*, 156 A.3d 1114, 1124 (Pa. 2017).

The Crimes Code prohibits carrying a firearm without a license:

[A]ny person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1). Section 6108 of The Crimes Code provides that

[n]o person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless

**(1)** such person is licensed to carry a firearm; or

**(2)** such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license).

*Id.* § 6108.

Finally, a person commits the crime of PIC as a first-degree misdemeanor "if he possesses any instrument of crime with intent to employ it criminally." *Id.* § 907(a).

- 7 -

In its September 5, 2023, opinion, the trial court reviewed the trial evidence in a light most favorable to the Commonwealth as verdict winner. According to the trial court, the victim's mother, Ms. Wright, testified

> that she knew [Appellant] and that her and [Appellant's] families "have history" and that at the time of Reid's murder, [Appellant] and Reid didn't have a good relationship. (N.T. 3-7-2023, pp. 42-45).

Trial Court Opinion, 9/5/23, at 5. The Commonwealth presented the testimony of Philadelphia Police Officers Harvel Brown and Theofanis Plialis. As described by the trial court,

> [Officer Brown] testified that on May 24, 2019, he responded to a radio call about shots fired, and upon arriving on the scene, saw a male on the highway in the northbound lane of 71st Street. The male, later determined to be [Reid,] told Officer Brown that he was shot in the back. Officer Brown … put [Reid] in his patrol car to rush him to Penn Presbyterian Hospital. (N.T. 3-7-2023, pp. 46- 50).
>
> … Officer [] Plialis testified that on May 24, 2019, he responded to the shooting in the area of 2525 South 71st Street, where the evidence [known to him] at the time was that a silver Infinity was seen fleeing from the scene, and officers were checking surveillance. He could see on the surveillance [video] that the Infinity had a heavy [window] tint, and damage to the driver['s] side bumper. Five days later, Officer Plialis found the car at 8500 Gibson Place, a place known [to police as a location] where stolen vehicles are [abandoned]. (N.T. 3-7-2023, pp. 58-60).

*Id.* at 5-6.

The trial court further summarized,

> Officer Dennis Moore from the Crime Scene Unit testified that he was [the] officer who processed the crime scene, taking photographs and collecting evidence[.] … Officer Theresa Weaver of the Crime Scene Unit was later assigned to process the 2010

- 8 -

silver Infinity that was brought into the police garage once it was found. (N.T. 3-7-2023, pp. 68-77, 85-95).

Assistant Medical Examiner Victoria Sorokin, M.D. [(Dr. Sorokin)], an expert in the area of forensic pathology[], … testified as to the autopsy [report]. Reid was pronounced dead at 3:25 a.m. on May 25, 2019, his cause of death being multiple gunshot wounds[,] and the manner of death was homicide. Reid's injuries included two gunshot wounds to the head, three gunshot wounds to the back, gunshot wounds to his right and left buttocks, and gunshot wounds to both the right and left forearms. Dr. Sorokin testified that she estimates that the decedent was shot nine times, with six bullets [that] were recovered during the autopsy. (N.T. 3-7-2023, pp. 102-117).

*Id.* at 6.

The trial court described testimony concerning the video evidence collected by police:

Detective Thorsten Lucke of the Homicide Unit[, who was qualified as] an expert in video recovery and analysis[, played for the jury] videos taken from multiple surveillance cameras around the crime scene, showing Reid walking in the area, and the silver Infinity, in the area before the shooting took place. Detective Lucke [presented] the video images of the vehicle, which showed distinct damage to the car, along with photographs of the [silver Infinity] that was recovered and processed during this investigation, showing the same damage. Video was shown [that depicted] Reid walking down the street and the [silver Infinity] driving past[,] going the opposite direction when they pass each other. The vehicle then comes back into view driving in the same direction as Reid, with the footage showing the vehicle following Reid's path. **The footage then shows the car pull up when** [**Appellant**] **exits the vehicle, runs over, shoots Mr. Reid and then runs back to the driver's side of the car before the car drives off.** The time period between when the [silver Infinity] first passes Reid to when the shooting began is approximately 5 minutes. (N.T. 3-7-2023, pp. 123-147).

*Id.* (emphasis added).

Regarding the firearms evidence,

- 9 -

Officer Robert Stott of the Firearms Identification Unit testified that there were 10 fired cartridge cases and six bullet specimens collected in this case, which were tested, and it was determined that the gun used in this case was a 9mm Luger. (N.T. 3-8-2023, pp. 49-56).

*Id.* at 8.

The trial court summarized the testimony describing Appellant's apprehension by police:

Detective James Simpkins testified that on September 12, 2019, [Appellant] was arrested in the City of Chester after a vehicle pursuit the day before. A blue Subaru had struck an Upland Police Officer, and that vehicle was chased to the City of Chester. Both occupants of the car fled, and [Appellant], the passenger in that car, was apprehended and arrested. **When the blue Subaru was searched, the keys to an Infinity were found in the glove box of that car**, and were turned over to Detective Mullen, who was investigating the murder of [] Reid. (N.T. 3-8-2023, pp. 12-22).

*Id.* at 7 (emphasis added).

[Detective Mullen] explained [that] when the silver Infinity was recovered, it had a license plate that was registered to [] Holly. However, **the paperwork found in the glove compartment had vehicle service receipts from Infinity of Ardmore with [Appellant's] name listed, and the license plate that was registered to [Appellant] for the silver Infinity was found in the trunk of the car.** (N.T. 3-9-2023, pp. 11-12, 16-20). [] Holly was the victim of theft a few years before[,] where his personal identification information was stolen[;] when contacted by Detective Mullen, [Holly] stated that he did not have a vehicle registered to him, and when shown the registration card, [Holly] stated that it was not his signature. Detective Mullen stated that he believed [Appellant] was the owner of the silver Infinity, and suggested to [] Holly that he was the victim of identity theft. (N.T. 3-9-2023, pp. 12, 36, 61-64, 76). Detective Mullen reiterated that the cell phone analysis showed that [] Holly was in a separate section of [Philadelphia] at the time of the shooting, while [Appellant] was in the area of the murder [and] where the vehicle was recovered.

Along with all the other evidence collected, including the paperwork from Infinity of Ardmore, the evidence indicated that [Appellant] was still in possession of the Infinity, and a search warrant was obtained for [Appellant's] residence, and executed on June 14, 2019. (N.T. 3-9-2023, pp. 24-28). After [Appellant] was arrested in the City of Chester, Detective Mullen was informed that when he was arrested, [Appellant] was a passenger in a blue Subaru, and recovered from that blue Subaru was a key fob for an Infinity vehicle. The key fob was turned over to Detective Mullen[,] and it was later confirmed that the Infinity key fob was for the Infinity [police] had confiscated in this case. (N.T. 3-9-2023, pp. 38-39).

*Id.* at 8-9 (paragraph break added).

The trial court summarized the Commonwealth's trial evidence of prior

police interactions involving same 2021 silver Infinity:

Officer Ernie Williams testified that approximately eleven months prior to Reid's murder, on June 21, 2018, he [effectuated a traffic] stop of a 2010 Infinity that was owned by [Appellant]. (N.T. 3-8-2023, pp. 39-44). Officer Jonathan Stralo testified that on August 4, 2019, he also stopped a silver Infinity, [] which [Appellant] was driving[,] and noted damage to the driver's side rear bumper quarter panel. (N.T. 3-8-2023, pp. 45-48). Police Officer Greg Coppola testified that he also made a [traffic] stop of [Appellant] on August 12, 2019, who was driving a 2010 silver Infinity, which was registered to [Appellant]. (N.T. 3-8-2023, pp. 67-68).

*Id.* at 7-8.

As explained by the trial court, the Commonwealth additionally

presented cellular location data from Appellant's phone:

Detective James Dunlop, an expert in the area of historical cell site analysis, testified that he took the data from outgoing and incoming calls on [Appellant's] phone to establish that around the time of the shooting, [Appellant] was in the area of the crime scene and, shortly thereafter, near the area where the silver Infinity was later recovered. Several of the phone calls [Appellant placed] were with Michael Davis, whose phone entered the same

- 11 -

geographical area as [Appellant's] phone, also in the area consistent with where the car was later recovered. Detective Dunlop also testified that he was asked to search the data for a phone number for [] Holly, and that he found that [Holly's phone] was far away from the crime scene at that time. (N.T. 3-8-2023, pp. 73-115).

*Id.* at 8. The trial court's recitation of the evidence is supported by the record.

The above-stated evidence is sufficient to sustain Appellant's conviction of first-degree murder. The Commonwealth presented surveillance video of Appellant exiting the silver Infinity, shooting Reid, and driving away from the scene. Paperwork found inside the Infinity listed a license plate number registered to Appellant, and service receipts in Appellant's name. Moreover, police later recovered a key fob for the Infinity from the glove compartment of a vehicle in which Appellant was a passenger. The Commonwealth presented data showing Appellant's presence near the scene of the shooting and near the location of the abandoned silver Infinity. Thus, the Commonwealth presented sufficient evidence to establish Appellant's identity as Reid's assailant. *See Commonwealth v. Stevenson*, 283 A.3d 196, 204 (Pa. 2022) ("It is well-established that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence and the [fact-finder], while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.").

In addition, the evidence established that Appellant shot Reid twice in the head and three times in Reid's back. This evidence is sufficient to establish Appellant's specific intent to kill. *See Hicks*, 156 A.3d at 1124 (recognizing

circumstantial evidence may prove specific intent where the defendant used a deadly weapon on a vital part of the victim's body). Thus, the evidence is sufficient to sustain Appellant's conviction of first-degree murder.

Regarding Appellant's VUFA convictions, the above-stated evidence was sufficient to prove Appellant carried "a firearm in any vehicle or … on or about his person[.]" 18 Pa.C.S.A. § 6106(a). Further, the evidence established Appellant carried a firearm on the public streets of Philadelphia. ***See id.*** § 6108. For these reasons, Appellant's challenge to the sufficiency of the evidence, merits no relief.

Appellant additionally challenges the verdicts as against the weight of the evidence.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. To successfully challenge the weight of the evidence, a defendant must prove the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

***Commonwealth v. Arias***, 286 A.3d 341, 352 (Pa. Super. 2022) (citations and quotation marks omitted).

In its opinion, the trial court addressed Appellant's claim and concluded it lacks merit:

> [The trial court] applied the appropriate standards when reviewing [Appellant's] claim that the verdict was against the weight of the evidence. Having reviewed the entire record, including a thorough reading of the trial transcripts and admitted exhibits, th[e] court concludes that the verdict was not so contrary to the evidence as to shock one's sense of justice, nor was it so tenuous, vague and uncertain that it shocks the conscience of the court. To the contrary, the evidence in this case was compelling and substantial, and strongly supported the verdict. Accordingly, [Appellant's] claim … is without merit.

Trial Court Opinion, 9/5/23, at 12. Based upon our review of the record, we discern no abuse of the trial court's discretion in rejecting Appellant's weight claim. As such, this issue merits no relief.

In his second issue, Appellant argues the trial court improperly admitted the testimony of Ms. Wright regarding the poor relationship between Appellant and decedent. Appellant's Brief at 34. Appellant argues this evidence was inadmissible hearsay. *Id.* Additionally, Appellant asserts, the trial court gave no limiting instruction regarding the jury's consideration of this improper relationship testimony. *Id.*

Appellant claims this evidence does not fall within any exception to the rule against hearsay. *Id.* at 36. Appellant asserts the evidence does not explain a course of conduct or the declarant's state of mind. *Id.* at 37-38. Appellant further disputes the trial court's characterization of the testimony as non-hearsay. *Id.* at 40-41. According to Appellant, the trial court

- 14 -

ignores that [Ms.] Wright did not testify, or offer any indication, that her expressed opinions were based on her own personal experiences, observations or knowledge. … [T]he trial court completely ignores that there is absolutely no testimony that indicates this was the result of [Ms.] Wright's interaction with the parties.

*Id.* at 41.

Appellant contends Wright's testimony does not fall within the state-of-mind exception to the rule against hearsay. *Id.* at 44. According to Appellant,

[Ms.] Wright's statements were offered as evidence of Appellant's state of mind, *i.e.*, his motive and/or intent. "However, the 'state of mind' exception traditionally applies to the declarant's state of mind, emotion, sensation or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health. *See* Pa.R.E. 803(3)" *Com. v. Levanduski*, 907 A.2d 3, 19 (Pa. Super. [] 2006).

*Id.* at 45.

Appellant further claims that Ms. Wright's testimony about the parties' relationship is based on "either the statements of the [v]ictim, or the statements of the Appellant; both of which are hearsay." *Id.* at 41. Without a foundation, Appellant argues, the testimony was inadmissible. *See id.* at 41-42. Using Oxford Languages Dictionary, Appellant points to Ms. Wright's use of the phrase "we all" in her statement, "we all have history," to indicate that her relationship testimony referred to the victim's beliefs. *Id.* at 42. Appellant points out Ms. Wright never stated that her relationship testimony was based on her own experiences, "nor was any such foundation laid." *Id.* Appellant asserts,

- 15 -

> It is manifestly unreasonable for the trial court to simply conclude that [Ms. Wright's] opinions are the result of this witness's interaction with all of the parties …, without a trace of any such foundational testimony.

*Id.* at 47 (internal quotation marks omitted).

Appellant argues this testimony caused him prejudice, as there was no evidence connecting him to the victim. *Id.* According to Appellant, there was no physical evidence linking him to the crime scene, only evidence regarding cell phone locations. *Id.* at 47-48. Appellant asserts, "By introducing evidence of motive and ill will it gives the jury a direct connection to consider between Appellant and [d]ecedent." *Id.* at 48 (capitalization modified).

Our standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Montalvo*, 986 A.2d 84, 94 (Pa. 2009) (internal citations and quotation marks omitted). "[A] discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa. Super. 2003).

To preserve a claim of error in an evidentiary ruling, a party must not only make a timely objection, but articulate "the specific ground" for the objection, "unless it was apparent from the context." Pa.R.E. 103(a)(1)(B).

"Hearsay is a statement the declarant **does not make while testifying at the current trial** … [and] is offered in evidence to prove the truth of the matter asserted." *Commonwealth v. Fitzpatrick*, 255 A.3d 452, 471 (Pa. 2021) (emphasis added) (citing Pa.R.E. 801(c)(1)-(2)) (ellipses and quotation marks omitted). "Hearsay generally is inadmissible unless it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence." *Commonwealth v. Rivera*, 238 A.3d 482, 492 (Pa. 2020).

With this in mind, we review the relevant testimony of Ms. Wright:

Q. [The Commonwealth:] Ms. Wright, do you know - or did you know the decedent in this case, [] Reid?

A. [Ms. Wright:] Yes. The decedent is my son.

Q. Your son. And how old was he when he was killed back in May of 2019?

A. Twenty-one years old.

Q. Ms. Wright, do you know the defendant in this case, [Appellant]?

A. Yes, I do.

Q. And how do you know him?

A. Our families have history.

Q. How long have you known [Appellant] and his family?

A. All of my life, and all of his life.

Q. Did your son, … did he know [Appellant]?

A. Yes, he did.

Q. And how did he know him?

- 17 -

A.  We all have history.  Our families have history.

Q.  And what was the state of their relationship?

A.  Those two didn't get along.

….

Q.  Okay. And did there come a time where you were told that your son had been shot?

A.  Yes.

Q.  When you learned that, where did you go?  Did you go to the hospital?

A.  After the call, yes.

Q.  [] And did you make it to the hospital before he was pronounced dead later that night at sometime after 3:00 a.m.?

A.  I was at the hospital when he was pronounced.

Q.  [] And you mentioned that your family and the [Appellant's] family, had history.  Was there ever a time when your families were close prior to the incident?

A.  Yes. We had good history all up until the day all of this happened.

Q.  [] But the relationship between your son –

[Defense counsel:]  Objection.

THE COURT:  Finish the question, please.

Q.  [The Commonwealth:]  But the relationship between your son and [Appellant], what was that at the time of the incident?

THE COURT:  Overruled.

[Ms. Wright:]   Their relationship wasn't a good relationship.

[Defense counsel]: Your Honor, may we see you at sidebar?

- - -

**(Whereupon, a discussion was held <u>off the record</u> at sidebar.)**

THE COURT: Overruled.

[The Commonwealth]: Thank you Ms. Wright. I have no further questions.

N.T. at 42-45 (emphasis added). Defense counsel declined to cross-examine Ms. Wright. *Id.* at 45.

We are unable to discern the basis for Appellant's objection, as the discussion following the objection took place off the record. There is nothing to suggest that Appellant challenged Ms. Wright's testimony based upon a lack of foundation. As such, we cannot grant him relief on his challenge to the lack of foundation for Ms. Wright's testimony. *See* Pa.R.E. 103(a)(1)(B).

However, the trial court discerned a challenge to the testimony as inadmissible hearsay:

The complained of testimony, plain and simple is not an out-of-court statement and[,] as such[,] is not hearsay. [Ms. Wright] stated that the families had a good history together that soured before the killing. **The witness did not state that she was told this by anyone**, but that it was her family and the family of [Appellant]. There isn't the slightest indication that this testimony wasn't the result of the witness' interaction with all of the parties, and **she gave every intimation that it was the result of her observation and interaction with her family and the family of the decedent.**

- 19 -

Trial Court Opinion, 9/5/23, at 13-14 (emphasis added). Given the lack of any explanation for defense counsel's objection,[4] and the testimony at issue, we discern no trial court error or abuse of its discretion. Ms. Wright did not testify regarding an out-of-court statement by a non-testifying witness. *See Fitzpatrick*, 255 A.3d at 471. Accordingly, Appellant's second issue merits no relief.

In his third issue, Appellant claims the trial court violated his Sixth Amendment right to a public trial, when it precluded his family from attending jury selection. Appellant's Brief at 53. Appellant explains,

> [j]ury selection began March 6, 2023, and all spectators, including Appellant's family members, were asked to leave the courtroom. ("I'm going to ask everybody to leave[.]" [N.T., 3/6/23, at 8.]). The court stated, "we have no room … in which to keep the individuals here. We have no place to put them, and we have no availability in order for them to watch from afar. So based on that, we're going to put the jury panel in here, and give them the very basic instructions. And then we will select the jury." [*See id.* at 8-9)].

*Id.* at 53-54 (citations modified). According to Appellant, his counsel objected to the exclusion of Appellant's family members. *Id.* at 54. Appellant states that only an off-the-record conversation between his counsel and the trial court took place, after which jury selection began without the public's presence in the courtroom. *Id.*

---

[4] Our review discloses no pre-trial motion to preclude Ms. Wright's testimony.

Appellant argues that the exclusion of the public from the courtroom violated his Sixth Amendment right to a public trial. *Id.* According to Appellant, "an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *Id.* (quoting *In re Oliver*, 333 U.S. 257, 271-72 (1948)). Appellant asserts, "the accused has the right to have the public attend *voir dire*." *Id.* at 55 (quoting *Commonwealth v. Jordan*, 212 A.3d 91, 101 (Pa. Super. 2019)).

Appellant acknowledges that closing a courtroom may be permissible under certain circumstances. *Id.* at 55 (citing *Jordan*, 212 A.3d at 102). Nevertheless, Appellant argues that even when "overriding interests" warrant closure, "if the parties petition the trial court to admit certain individuals, the trial court must consider that request and place on the record the reasons for denying the request." *Id.* at 56 (citing *Waller v. Georgia*, 467 U.S. 39, 48 (1984)). According to Appellant, the trial court erred because it failed to find an overriding interest; "rather it merely stated there was no room." *Id.* at 57.

Appellant directs our attention to the United States Supreme Court's decision in *Presley v. Georgia*, 558 U.S. 209 (2010). Appellant's Brief at 56. In *Presley*, Appellant argues, the Supreme Court recognized there are "circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*." *Id.* at 56 (quoting *Presley*, 558 U.S. at 215). According

to Appellant, if the parties nevertheless petition the court to admit certain individuals, the court must consider that request and place on the record its reasons for denial. *Id.* (citing *Jordan*, 212 A.3d at 102).

Appellant further claims the trial court failed to consider reasonable alternatives to a complete ban of the public. *Id.* at 58. Appellant argues, "the court did not explain why a less broad remedy was not available, nor did it consider one." *Id.* Appellant contends the trial court's failure to consider reasonable alternatives, or place its findings on the record, cannot pass muster under *Waller* and *Presley*. *Id.* at 58, 59. According to Appellant, the trial court's structural error of (a) closing *voir dire* to the public after Appellant requested that his family remain; (b) failing to consider reasonable alternatives; and (c) failing to place adequate reasons on the record warrants a new trial, even without a finding of prejudice. *Id.* at 60.

In reviewing an order to close a courtroom, we accept the trial court's factual findings if they are supported by the record. *Jordan*, 212 A.3d at 102-03. In all other respects, we review the order for an abuse of discretion. *Id.* at 103.

"A defendant has a Sixth Amendment right to a trial that is open to members of the public." *Id.* at 101 (citation omitted); *see also* PA. CONST. art. 1, § 9. However, the United States Supreme Court has held that, although a defendant has the right to a public trial, a court may close the courtroom if the following factors are met:

(1) there is "an overriding interest that is likely to be prejudiced," (2) the closure is "no broader than necessary to protect that interest," (3) the trial court considers "reasonable alternatives" to closure, and (4) the trial court makes "findings adequate to support the closure."

*Jordan*, 212 A.3d at 101 (quoting *Waller*, 467 U.S. at 48). "The violation of the right to a public trial constitutes a structural defect, a specific type of constitutional error warranting a new trial without any showing of prejudice." *Id.* at 103 (citation omitted).

Courtrooms can be closed in situations to keep certain evidence confidential or to preserve order and safety. *See id.* It is "the responsibility of the [trial] court to maintain not only the control but also the security of the courtroom[.]" *Id.* at 102.

Our review discloses the following. On March 6, 2023, the trial court called Appellant's case for trial. N.T., 3/6/23, at 3. In open court, the trial court swore in Appellant and colloquied him regarding his education, sobriety and competence. *Id.* at 3-5. The trial court inquired about the Commonwealth's plea offer, which Appellant had declined. *Id.* at 5-6. The trial court further inquired about Appellant's satisfaction with his plea counsel. *Id.* at 6. Appellant confirmed his decision to proceed with jury selection. *Id.* at 7-8.

Upon completing this colloquy, the trial court asked that the potential jurors be seated in court. *Id.* at 8. At that time, the following discussion took place:

THE COURT: Okay. We're going to bring in the panel.

THE COURT OFFICER: All right. Ladies and gentlemen, I'm going to ask everybody to leave. It's going to take us about two hours or so, so if you guys want to get something to eat and stuff like that, you're welcome to do that. Please do not hang out in this hallway here for the time being. Thank you.

THE COURT: Thank you all. [Appellant], **the reason they're going out is because we have no place else to put the jury panel, and I have to discuss with them – tell them the law and some other things while we're picking.** Okay?

[Appellant]: Okay.

[Defense Counsel]: Judge, just based on … that case that came out that overturned a murder conviction because … one of the other judges … had the family step outside. And the Supreme Court suggested that it is not a good idea; that you have to let them in. That's at least what the case said. So for the record, I have to object. But the reason is because there's only this amount of room in the room.

THE COURT: **We have no room – on the record, we have no room in which to keep the individuals here. We have no place to put them, and we have no availability in order for them to watch from afar. So based on that, we're going to put the jury panel in here, and give them the very basic instructions.** And then we will select the jury.

Once we select the jury, and get into the more elaborate rules and regulations and laws that will follow, the families will be permitted to be here.

[Defense counsel]: Judge, just for the record though, I will be object[ing] based on that recent ruling.

*Id.* at 8-10 (emphasis added).

Outside of the presence of Appellant's family, the trial court swore in the jury pool and issued a general instruction regarding what takes place during trial. *Id.* at 10-17, 22-23. The trial court generally inquired regarding jurors'

- 24 -

potential conflicts, *see id.* at 17-22, and inquired whether any juror could not serve because of extraordinary hardship, *see id.* at 23-24. Thereafter, the trial court dismissed all but the first panel of potential jurors for questioning. *Id.* at 25-26. **At that time, the trial court permitted Appellant's family members to return.** *Id.* at 27. Appellant's family was not excluded from the subsequent questioning of the individual jurors, or the selection of the jury panel. *See id.* at 30.

> In addressing this issue, the trial court stated the following:
>
> In the case at bar, the courtroom was only closed while the entire panel was given a brief synopsis of the law, advising how the jury selection and trial would proceed. **The jury panel was asked a few questions as a panel that would aid in a determination of their ability to be fair, but they were not questioned about those matters until individual *voir dire* was conducted <u>and the spectators were back in the courtroom</u>.** At that time, the families were permitted back into the courtroom, to view each prospective juror and how they answered each and every question. A court may impose reasonable restrictions on access to the courtroom and clearly, the two purposes served by a public trial of preventing the accused from being subject to a Star Chamber proceeding and assuring the public that the standards of fairness were observed. … ***Commonwealth v. Berrigan***, 509 Pa. 118, 134, 501 A.2d 226, 234 (1985)….

Trial Court Opinion, 9/5/23, at 19 (emphasis added).

Our review thus discloses (1) there was an overriding interest, as the pool of potential jurors was so large that exclusion of the public was necessary to initially seat the jury pool; (2) the closure was no broader than necessary, as the trial court allowed Appellant's family to return during individual *voir*

*dire* and jury selection;[5] (3) the trial court implemented a reasonable alternative by only addressing the potential jurors generally, and reopening the courtroom during individual *voir dire*; and (4) the trial court placed sufficient findings on the record to support its decision. **See Jordan**, 212 A.3d at 102. Under these circumstances, we discern no constitutional violation by the trial court during jury selection. **See id.** Appellant's third issue merits no relief.

In his fourth and final issue, Appellant argues that the trial court improperly admitted into evidence, and allowed the jury to view, the medical examiner's photographs of Reid: Exhibits D2, D7, D11, and D12. Appellant's Brief at 48. Appellant argues Exhibit D11 was improperly admitted, as the trial court previously ruled this exhibit could not be presented. **Id.** at 49. Regarding the other three exhibits, Appellant explains that the photos at issue

> are 8½" x 11" full glossy photographs of [Reid's] [c]orpse in the Medical Examiner's office. The photos depict bloody gunshot wounds to [Reid's] face, arm, back and buttocks….

**Id.** at 60 (citation omitted). Appellant argues,

> [i]n **Com. v. Chacko**, 480 Pa. 504, 506 (Pa. 1978), the Pennsylvania Supreme Court found similar photographs as to the ones at issue to be inflammatory. It follows the photos at issue in the case at bar are also inflammatory. With regards to D11, we must presume that the trial court found it to be inflammatory, as it was objected to and precluded.

_____

[5] Moreover, a full and complete transcript was made of what took place during the general instructions.

*Id.* at 50-51 (capitalization modified; citation omitted).

Appellant asserts the photographs are not of "essential evidentiary value," as a pathologist could have effectively testified without the use of these exhibits. *Id.* at 51. Appellant agues, "such photos should not be resorted to where the witness can clearly convey the facts to the jury without their use." *Id.* at 52 (quoting *Commonwealth v. Scaramuzzino*, 317 A.2d 225, 227 (Pa. 1974)). Appellant asserts there is no reason that the medical examiner "could not have adequately and effectively testified without the use of these photographs." *Id.* at 52. Appellant states he did not contest the nature of the wounds, cause of death, or that a deadly weapon was used. *Id.* at 52-53. Appellant further emphasizes no one contested that this was a murder. *Id.* at 53. Thus, Appellant argues, the photographs did not advance the Commonwealth's case. *Id.*

The Commonwealth counters that the photos "were relevant to support an inference of specific intent to kill." Commonwealth's Brief at 14. The Commonwealth claims the photos were "crucial to helping the jury understand the medical examiner's testimony regarding the location and nature of the victim's injuries." *Id.* at 14-15. The Commonwealth points out the trial court issued cautionary instructions regarding the jury's consideration of this evidence. *Id.* at 16.

Regarding Exhibit D11, the Commonwealth asserts there is no evidence the prosecutor intentionally violated the court's ruling. *Id.* at 17. In addition,

the Commonwealth argues D11 was not materially different in type from the other post-mortem photos admitted. *Id.* The Commonwealth points out the trial court offered no reason for excluding Exhibit D11. *Id.* at 18. At best, the Commonwealth posits, this exhibit was merely cumulative of other properly admitted evidence. *Id.*

We reiterate the admissibility of evidence lies within the sound discretion of the trial court. *Montalvo*, 986 A.2d at 94.

> When the Commonwealth seeks to introduce photographs of a homicide victim into evidence, the trial court must engage in a two-part analysis. First, the trial court must examine whether the particular photograph is inflammatory. *Commonwealth v. Murray*, … 83 A.3d 137, 156 (Pa. 2013). If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. *Id.* If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Id.*

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015).

At trial, the Commonwealth introduced the photographs through testimony of Dr. Sorokin, the Commonwealth's expert pathologist from the Philadelphia Medical Examiner's Office. N.T., 3/7/23, at 101. Dr. Sorokin explained that Dr. Lindsey Emery of the Philadelphia Medical Examiner's Office performed Reid's autopsy. *Id.* at 105. However, Dr. Emery left the Medical Examiner's office before the time of trial. *Id.*

Dr. Sorokin reviewed the autopsy report, and testified regarding the report's description of the victim's wounds. *Id.* at 107-08. Based upon the

wounds, Dr. Sorokin opined that the victim had sustained nine gunshot wounds. *Id.* at 110.

Dr. Sorokin acknowledged and explained the difference between the autopsy report's estimation of seven wounds, as opposed to her opinion that the victim sustained nine wounds. *Id.* at 111. Dr. Sorokin confirmed that the original examiner recovered six bullets. *Id.* Regarding Exhibit D2, Dr. Sorokin explained,

> on this photograph we can see what I described as the gunshot wound to the chin, the entrance. And next to the nose, on the left, is the entrance of the gunshot wound to the left nasolabial fold. And there is also a laceration to the lip.

*Id.* at 112. Regarding Exhibit D4, Dr. Sorokin opined, "[t]his might be one of the abrasions that were discovered in the blunt trauma." *Id.*

Dr. Sorokin described Exhibit D5 as depicting

> the gunshot wounds to the right of the forearm. Again, I was describing several entrances with several fragments of the projectile being present in the muscle.

*Id.* at 112-13. Dr. Sorokin described Exhibit D6 as showing the "gunshot wound to the left forearm. The main entrance is in the center, and there are several, what looks like, fragment … entrances." *Id.* at 113. According to Dr. Sorokin, Exhibit D7 showed the exit "of the previous entrance." *Id.* Dr. Sorokin testified Exhibit D9 "might have been either one of the lacerations or one of the shrapnel fragments." *Id.*

Dr. Sorokin described D10 as

the gunshot wound to the left back. This is the one that went through the rib and the lower lobe of the left lung and lodged in the thoracic vertebrae.

*Id.* Regarding Exhibit D11, Dr. Sorokin described her uncertainty concerning the cause of the wound:

When I reviewed the photographs, … since I didn't notice the description of this in the gunshot wound trauma, looking at it, I assumed it might have been a laceration. However, it might have been a laceration from the bullet fragment. I'm not 100 percent sure on this. However, again, this could be a laceration, which is blunt trauma.

*Id.* at 113-14. Dr. Sorokin described Exhibit D12 as depicting the

gunshot wound to the lateral left buttock. That's the one that went above the projectile. And this is one that went above the bone and hit the aorta.

*Id.* at 114.

We discern no abuse of the trial court's discretion in admitting the photographs. Our review of the photographs discloses that, while disturbing, they are not inflammatory. The photographs are in color, but would not shock the sensibility of the viewer, given the nature of the alleged crimes.

Significantly, the photos were of evidentiary value to explain Dr. Sorokin's testimony regarding the number and type of wounds sustained by the victim. In particular, the photos had evidentiary value to explain differences between Dr. Sorokin's opinion and statements in the autopsy report. *See generally Woodard*, 129 A.3d at 494.

The record further discloses the trial court issued the following cautionary instruction following closing arguments:

> [P]hotographs were admitted for the purpose of showing the nature of the wounds received by the decedent and for showing the conditions of the scene of the alleged crime to help [the jury] understand that testimony of the witnesses. They are not pleasant photographs to look at. You should not let it disturb your emotions to the prejudice of [Appellant]. Your verdict must be based on a rational and fair consideration of all the evidence and not on passion or prejudice against [Appellant], the Commonwealth, or any[]one else in that group ….

N.T., 3/11/23, at 11. Juries are presumed to follow cautionary instructions.

***Commonwealth v. Fitzpatrick***, 255 A.3d 452, 487 (Pa. 2021). Under these circumstances, we discern no error or abuse of the trial court's discretion in admitting any of the photos. For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

P.J. Lazarus joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/24/2024